170 F.3d 598
 160 L.R.R.M. (BNA) 2713, Pens. Plan Guide (CCH) P 23952H
 Thomas C. WILLIAMS, Plaintiff,
Roosevelt Cook, Ray L. Reber, Individually and on behalf of
all others similarly situated, Plaintiffs-Appellants,
v.
WCI STEEL COMPANY, INC.; United Steelworkers of America,
AFL-CIO, CLC; Thomas A. Fair; Raymond McDonald,
Defendants-Appellees.
 No. 97-3984.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 29, 1998.
Decided March 17, 1999.
 
 Joseph F. Hutchinson, Jr. (briefed), Marc B. Merklin (argued and briefed), Brouse & McDowell, Akron, OH, for Plaintiffs-Appellants.
 James L. Blomstrom, Harrington & Mitchell, Youngstown, OH, Jeffrey S. Russell (briefed), Gregory A. Hewett (briefed), Thomas C. Walsh (briefed), Law Office of Bryan Cave, St. Louis, MO, Julia Penny Clark (argued and briefed), Paul M. Zimmerman (briefed), Bredhoff & Kaiser, Washington, D.C., for Defendants-Appellees.
 Before: JONES, RYAN, and MOORE, Circuit Judges.
 OPINION
 PER CURIAM.
 
 
 1
 Plaintiffs-appellants Roosevelt Cook and Ray L. Reber, on behalf of themselves and a class of persons similarly situated[1] (collectively "plaintiffs") seek reversal of the district court's dismissal of their lawsuit against WCI Steel Company ("WCI"), the United Steel Workers of America ("USWA"), AFL-CIO, Thomas A. Fair, and Raymond McDonald (collectively "defendants") seeking to restore benefits allegedly promised in a 1988 trust agreement. In the lawsuit, the plaintiffs asserted claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA"), and state claims for breach of contract and breach of fiduciary duty. For the reasons stated herein, we reverse and remand the district court's dismissal of the LMRA § 301 claim, but otherwise affirm the judgment below.
 
 I.
 
 2
 Defendant-appellee WCI owns and operates a steel manufacturing facility in Warren, Ohio, which it purchased from LTV Steel Company ("LTV") in 1988. Defendant-appellee USWA represented employees of the facility both before and after the sale to WCI. Fearful that the change in ownership would adversely affect the workers of the facility, the sale was conditioned upon the entering of an agreement (the "Memorandum Agreement") to provide funding of certain benefits in the event that WCI, a new company with no historic labor record, shut down the facility and was unable to pay liabilities to the union and its members.
 
 
 3
 The Memorandum Agreement was formulated between LTV and its workers on August 30, 1988. Among other things, the Memorandum Agreement called for the creation of a Security Enhancement Trust ("SET") funded by WCI in the amount of $21 million. The SET was formally created in November 1990 by LTV, USWA, and the Bank One Trust Company. Additionally, the Memorandum Agreement called for the appointment of two trustees. Defendants-appellees McDonald and Fair were the trustees appointed by USWA and WCI, respectively.
 
 
 4
 Only one of the provisions of the Memorandum Agreement is at issue in this appeal. The Memorandum Agreement stated that, if the facility did not close within seven years, then within 30 days thereafter, the funds specified above would be used to "provide employee and/or retiree benefits for Recipient Employees and the SET shall be dissolved." J.A. at 39. "Recipient Employees" were defined as employees of the facility who were participating in the LTV pension plan at the time of the sale. J.A. at 38. At the close of the seven-year period in 1995, some Recipient Employees remained as active WCI employees and some, including the named plaintiffs in this appeal, had retired.
 
 
 5
 The facility was not shut down during the seven-year period and, by 1995, the SET assets had grown to $28,400,000. However, a bitter and prolonged strike began at the facility one day after the seven-year period expired. In October 1995, pursuant to a new collective bargaining agreement, USWA and WCI agreed to an allocation of the residue of the SET assets. The assets were used to provide initial funding for a new WCI pension plan, to provide retiree life and health care benefits, and to fund bonuses for Recipient Employees. Plaintiffs allege that the new pension plan diverted approximately half of the trust funds for the benefit of not only the Recipient Employees, but also workers hired by WCI after the 1988 purchase of the facility.
 
 
 6
 On January 23, 1996, plaintiffs brought suit in the district court. Following two amendments to the complaint, defendants filed a motion to dismiss.[2] The defendants argued that (1) the Memorandum Agreement was not an "employee benefit plan" as recognized by ERISA, (2) the plaintiffs did not have a "vested" interest in the claimed benefits under § 301 of the LMRA, and (3) plaintiffs' state law claims were preempted by § 301. On July 31, 1997, the district court granted the motion and dismissed the complaint in its entirety.
 
 
 7
 This timely appeal followed. This court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 II.
 
 8
 The three difficult issues present in this case were not adequately addressed by the district court's disposition. Of the three-the construction of ERISA and LMRA, and the preemption of state claims, the district court inexplicably addressed only the ERISA claim. This may, in part, explain the brevity of the Memorandum Order which was a scant six pages in length, and contained no legal reasoning or discussion of the LMRA or state law claims.
 
 
 9
 On this point, we are instructed by this court's opinion in Terry Barr Sales Agency, Inc. v. All Lock Co., 96 F.3d 174, 178 (6th Cir.1996). Writing for the court, Chief Judge Martin expressed "strong disapproval" at the district court's failing to provide a written explanation of its analysis in dismissing a case. He wrote that such an explanation "would have been extremely helpful for review in this case." We hold the same view with respect to this case. However, rather than remand, which would further delay final disposition to the unfair detriment of the parties, we will proceed to the merits of the issues in this case.
 
 III.
 
 10
 Dismissal of a complaint under Fed.R.Civ.P. 12(b)(6) is a question of law subject to de novo review. Sistrunk v. City of Strongsville, 99 F.3d 194, 197 (6th Cir.1996); Bower v. Federal Express Corp., 96 F.3d 200, 203 (6th Cir.1996). Dismissal may be granted only if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Ang v. Procter & Gamble Co., 932 F.2d 540, 544 (6th Cir.1991) (citing Conley v. Gibson, 355 U.S. 41 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). We must construe the complaint in a light most favorable to the plaintiff, and accept all factual allegations as true. Sistrunk, 99 F.3d at 197; Cline v. Rogers, 87 F.3d 176, 179 (6th Cir.), cert. denied, 519 U.S. 1008, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996).
 
 
 11
 The district court dismissed the plaintiffs' ERISA claim because it found that the Memorandum Agreement did not qualify as an "employee benefit plan," and thus, merited no ERISA protection. Plaintiffs argue on appeal that the Memorandum Agreement provision, directing the SET trustees to allocate the trust residue to "provide employee and/or retiree benefits for Recipient Employees," qualifies as an ERISA plan. Under ERISA, an "employee benefit plan" may be either an "employee welfare benefit plan" and/or an "employee benefit pension plan." 29 U.S.C. § 1002(3); Fugarino v. Hartford Life & Acc. Ins. Co., 969 F.2d 178, 183 (6th Cir.1992). An "employee welfare plan" is defined as
 
 
 12
 any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on the retirement or death, and insurance to provide such pensions).
 
 
 13
 29 U.S.C. § 1002(1)(West Supp.1998). An "employee pension benefit plan" is
 
 
 14
 any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the benefits under the plan or the method of distributing the benefits from the plan.
 
 
 15
 29 U.S.C. § 1002(2)(A) (West Supp.1998).
 
 
 16
 In determining whether or not a benefit plan exists under ERISA, courts have generally followed the approach as articulated by the Eleventh Circuit in Donovan v. Dillingham, 688 F.2d 1367 (11th Cir.1982)(en banc ). Under the Dillingham test, an ERISA plan exists if a reasonable person can ascertain (1) the intended benefits, (2) the class of beneficiaries, (3) the source of financing, and (4) the procedures for receiving benefits. Id. at 1373.[3] The purported plan need not be formal or written to qualify as an ERISA benefit plan, but rather, the court must look to the "surrounding circumstances" to see if the four factors have been met. Id. at 1372-73; accord Fugarino, 969 F.2d at 185.
 
 
 17
 Two of the Dillingham factors are not in dispute in this appeal. The class of beneficiaries and source of funding for the residual "employee and/or retiree benefits" promised in the Memorandum Agreement are adequately defined. Benefits are to be provided to "Recipient Employees" who, in turn, are defined as employees who were participating in the LTV pension plan at the time of the sale of the facility. The source of funding is the residue of the $21 million trust established by the agreement. The only Dillingham issue is, given the circumstances, whether a reasonable person could ascertain the intended benefits and procedures for receiving benefits.
 
 
 18
 Plaintiffs argue that the benefits are ascertainable. The Memorandum Agreement clearly states that the $21 million set aside is to be allocated among the Recipient Employees. Once the seven-year period for closure of the facility passed, these funds would have been distributed pursuant to the administrative scheme which Trustees Fair and McDonald would implement, after making appropriate distributions to eligible recipients during the seven-year period.
 
 
 19
 Defendants counter that plaintiffs misconstrue the Dillingham factors. According to defendants, the fallacy of plaintiffs' argument is that they assume that the mere existence of the $21 million trust and an administrative scheme satisfies the Dillingham factors. With regards to the contention that the "ascertainable benefits" is the $21 million trust, defendants respond that a court must be able to ascertain both the amount and the nature of the benefits. At best, the Memorandum Agreement promised some form of benefits to plaintiffs. However, nothing in the Memorandum Agreement specified the extent of the benefits, or whether those benefits were to come in the form of medical coverage, insurance, vacation, unemployment or other type of benefits as enumerated by § 1002(1). Similarly, the Memorandum Agreement did not set forth specific procedures for administering any benefits, but rather deferred the formulation of the administrative scheme until after the seven-year period.
 
 
 20
 We are of the opinion that defendants are correct that the Memorandum Agreement does not satisfy the Dillingham test. Other circuits have rejected similar claims for amorphous benefits as plaintiffs make here. For example, in Siemon v. AT & T Corp., 117 F.3d 1173, 1179 (10th Cir.1997), an informal plan to provide payments of up to $1,000 to employees for death, sickness, accident, or financial emergencies was held not to be an ERISA plan because the "potential benefits [were] too ephemeral and contingent for [the court] to ascertain, what, if anything, AT & T intends an employee to receive." Additionally, in Diak v. Dwyer, Costello & Knox, P.C., 33 F.3d 809 (7th Cir.1994), the Seventh Circuit held that ad hoc pension arrangements with individual retirees did not constitute an ERISA plan. Particularly, the court "could not begin to fashion appropriate relief for Diak, since we do not know whether he was the type of employee [that the employer] intended to cover, or what benefits are due." Id. at 813.
 
 
 21
 Granted, the Memorandum Agreement, unlike the purported plans in Siemon and Diak, contained a well-defined total pool of benefits and class of beneficiaries. However, both cases stand for the proposition that a putative benefit plan involving unspecified individual benefits does not qualify as a plan under ERISA. Assuming that plaintiffs were to prevail on their ERISA claim, the district court would have to fashion essentially all of the details of the purported plan and determine exactly what benefits would go to which employees or retirees, since no one can ascertain what WCI intended to provide for its workers. Simply identifying the source and amount of the benefits is not enough to satisfy the Dillingham factors. A reasonable person must also be able to determine the type of benefits the employer intended to bestow upon the employee/retiree. At best, the Memorandum Agreement merely states that a decision would be made on what benefits the Recipient Employees would receive after the seven-year period.
 
 
 22
 For similar reasons, we are convinced that the Memorandum Agreement would also fail the Dillingham test since it does not create the requisite scheme to administer the benefits. Plaintiffs rely on Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) and Simas v. Quaker Fabric of Fall River, 6 F.3d 849 (1st Cir.1993) to support their argument that administrative requirements need not be burdensome in order for a plan to qualify for ERISA protection. In both Fort Halifax and Simas, the Supreme Court and the First Circuit respectively held that a state statute requiring employers to make a lump sum severance payment to employees was not preempted by ERISA. Fort Halifax, 482 U.S. at 15, 107 S.Ct. 2211; Simas, 6 F.3d at 853. Plaintiffs argue that it is nonsensical to analogize (as defendants did in the district court) from the termination of the SET after the seven-year period to a lump sum severance package because the Memorandum Agreement required Trustees Fair and McDonald to oversee the SET funds for seven years, and then determine the owed benefits to each eligible recipient.
 
 
 23
 As was the case in its argument that the $21 million trust fund constituted "ascertainable" benefits, plaintiffs read too little into Dillingham 's requirement that an administrative scheme be ascertainable. Fort Halifax and Simas are of only limited relevance to this case since they dealt with issues of ERISA preemption, not ERISA qualification. We believe the situation in the case sub judice is more akin to that faced by the Fourth Circuit in Elmore v. Cone Mills Corp., 23 F.3d 855 (4th Cir.1994) (en banc ). In that case, although the intended benefits, beneficiaries, and source of funding were arguably clear, the procedure for recovering benefits was not ascertainable until later when a formal Employee Stock Option Plan was created. Elmore, 23 F.3d at 861-62. Because of this deficiency, the Fourth Circuit held that the plan at issue failed the Dillingham test. Id. at 862.
 
 
 24
 We agree with the reasoning of the Fourth Circuit. In our view, Dillingham requires more than just the existence of an administrative scheme. If a reasonable person cannot ascertain the claims procedures in a purported plan, then the plan is not an "employee benefit plan" under ERISA. Thus, because the Memorandum Agreement fails at least two of the Dillingham factors, we will affirm the conclusion of the district court that plaintiffs did not state a viable claim under ERISA.
 
 IV.
 
 25
 As mentioned supra, the district court failed to address either the LMRA § 301 claim or the state claims below. Plaintiffs do not argue that this was per se error, nor could they. We have previously stated that when a "district court dismiss[es a] claim without stating a reason for doing so, 'an appellate court may affirm on any ground supported by the record.' " Pilgrim v. Littlefield, 92 F.3d 413, 416 (6th Cir.1996) (quoting Warda v. Commissioner, 15 F.3d 533, 539 n. 6 (6th Cir.1994)).
 
 
 26
 Section 301 of the LMRA creates a cause of action for "violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). Plaintiffs contend that the Memorandum Agreement and SET Agreement were agreements reached through collective bargaining. Plaintiffs argue that WCI and its agent (Fair) wrongfully misused assets in the $21 million trust fund for purposes other than those stated in the Memorandum Agreement. Specifically, plaintiffs allege that defendants improperly designated half the funds to create a new pension fund that would cover non-Recipient Employees, and also that defendants unfairly allocated the balance of the residue between the retired and the active Recipient Employees.
 
 
 27
 As a matter of federal law, an employer who promises to pay benefits for the lifetime of a retired employee must keep that promise. If such a promise appears in a collective bargaining agreement ("CBA"), breaking that promise is a breach of the agreement and a violation of § 301. Generally, a district court has jurisdiction over § 301 claims only while the CBA upon which the benefits are based remains in force. See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 206, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). Defendants argue that the 1988 CBA which created the Memorandum Agreement and the SET Agreement, was superseded by the new 1995 CBA which included the final allocation of the SET fund. This court has said that a district court has no jurisdiction over cases contesting the validity of a CBA (as opposed to cases seeking to enforce a CBA). See Adcox v. Teledyne, Inc., 21 F.3d 1381, 1386 (6th Cir.1994); Heussner v. National Gypsum Co., 887 F.2d 672, 676 (6th Cir.1989). Thus, whether the Memorandum Agreement provided plaintiffs with vested rights is dispositive of the § 301 claim in this case.
 
 
 28
 While a union may bargain away non-vested retiree benefits in favor of more compensation for active employees, it may not do such with the vested rights of its retirees. Weimer v. Kurz-Kasch Inc., 773 F.2d 669, 672-73 (6th Cir.1985); Policy v. Powell Pressed Steel Co., 770 F.2d 609, 613 (6th Cir.1985). This rule is justified by the realization that retirees, who are no longer members of the bargaining unit, have no power in subsequent negotiations, and that the agent for the union is under no statutory duty to represent them. See Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co., Chem. Div., 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); Policy, 770 F.2d at 613; Sparks v. Ryerson & Haynes, Inc., 638 F.Supp. 56, 60 (E.D.Mich.1986) ("[N]ormally a retiree's benefits are considered vested because a retiree is unprotected in the collective bargaining process"). Additionally, our opinion in International Union UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983), articulated an "inference" that retiree benefits are vested benefits. Specifically, we stated:
 
 
 29
 [R]etiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.
 
 
 30
 Id. at 1482; see also Policy, 770 F.2d at 613 ("[T]his court [has] recognized that normally retiree benefits are vested"). It is important to remember that the Yard-Man "inference" that retiree benefits are vested is not a "presumption" that the benefits are vested. See International Union UAW v. Cadillac Malleable Iron Co. 728 F.2d 807, 808 (6th Cir.1984). So while this court will generally afford a liberal construction of retirees' rights with regard to benefits, it will not place the burden on the employer to show that benefits had not vested.
 
 
 31
 The parties present essentially the same arguments as they did with regard to the ERISA claim. Plaintiffs contend that they had a vested, accrued, non-contingent, and interminable right to the SET fund monies when the steel facility was still in operation after the seven-year period had expired. Defendants counter that the Memorandum Agreement does not specify the form of the benefits to be provided to the Recipient Employees. Therefore, defendants reason, the plaintiffs never had a vested interest in such benefits, because the benefits were not particularized.
 
 
 32
 We have stated that a "court may use standard principles of contract interpretation to determine whether a right is vested." Cincinnati Typographical Union v. Gannett, 17 F.3d 906, 910 (6th Cir.1994) (citing Yard-Man, 716 F.2d at 1479-80). To determine if the parties intended a right to vest, we look to the contractual language or extrinsic evidence. Id.
 
 
 33
 The relevant provision of the Memorandum Agreement states as follows:
 
 
 34
 If there has not been a permanent closing of the Warren Works during the Seven-Year Period, and after depositing the remaining Increased Contributions ... the assets remaining in the SET, within thirty days, shall be allocated by the Trustees to provide employee and/or retiree benefits for Recipient Employees and the SET shall be dissolved.
 
 
 35
 J.A. at 39. At the very least, a reasonable reading of the Memorandum Agreement supports plaintiffs' interpretation that as "Recipient Employees," they were promised "the assets remaining in the SET" at the expiration of the seven-year period. By allocating the trust residue to new WCI employees who were not part of the defined class of "Recipient Employees," material issues of fact clearly exist as to whether defendants breached their § 301 obligations to plaintiffs. On this ground alone, we believe that the district court's grant of summary judgment to the defendants was improper. See Bower v. Bunker Hill Co., 725 F.2d 1221, 1223 (9th Cir.1984) (reversing summary judgment in § 301 suit when ambiguities existed in collective bargaining agreement).
 
 
 36
 Additionally, the structure of the trust agreement as well as the circumstances of its formation indicate that the rights specified were vested in the former LTV employees. In this case, the trust provisions at issue were not incorporated within a collective bargaining agreement, but instead were memorialized in a separate Memorandum Agreement. Again, WCI was not a party to this agreement, and there were no provisions for its assignment. It is clear from the Memorandum Agreement that the trustees' responsibility was to make interim payments provided for in the agreement, to make the final allocations in the event that the plant did not close, and in that case, to wrap up the trust after seven years. In all respects, this was a self-contained, self-administering, and self-expiring trust.
 
 
 37
 The discrete nature of the agreements in question and their memorialization in a trust document strongly imply that it was the intent of the parties that this agreement remain in force, for its limited life, independent of the negotiation of subsequent CBAs between the new owner of the facility and union. Moreover, the trust agreement included a specific procedure that allowed the parties to amend the agreement to optimize tax treatment. The implication of this limited amendment provision is that broader amendment was not intended. Finally, as the plaintiffs point out, nothing in the language of the agreement indicated that the disposition of the trust residue was to be the subject of future collective bargaining or that the rights provided by these agreements could be forfeited. Cf. Turner v. Local Union No. 302, International Brotherhood of Teamsters, 604 F.2d 1219, 1225 (9th Cir.1979) (no § 301 claim when Trust Agreement expressly authorized trustees to decrease benefits).
 
 
 38
 Defendants rely on our decision in Pierce v. NECA-IBEW Welfare Trust Fund, 620 F.2d 589 (6th Cir.1980) (per curiam ), to support their claim that plaintiffs had no vested rights under the Memorandum Agreement. In that case, the trustees of a welfare fund reduced the scope of health care coverage for the beneficiaries after a large contributor withdrew from participation in the fund, thus diminishing fund resources. Id. at 590. We affirmed the trial court's determination that no LMRA violation occurred when the trustees reduced the amount of health coverage afforded to eligible beneficiaries. In particular, the Trust Agreement in Piercespecifically gave discretion to alter the benefit rules for participation in the trust fund. Id. Because the Memorandum Agreement in this case similarly empowers the trustees to allocate the trust residue among the Recipient Employees, defendants argue that plaintiffs in this case had no vested rights to any benefits.
 
 
 39
 Defendants' reliance on Pierce is misplaced. The participants in Pierce sought reinstatement of a particular benefit. Plaintiffs in the case sub judice do not claim-nor can they under the reasoning of Pierce-that they have vested rights to a particular benefit, such as health coverage or life insurance. Rather, plaintiffs are contending that they had a vested right in the distribution of the trust resources solely within the limited, defined named beneficiaries in the Memorandum Agreement. When the trustees allocated the trust assets to members outside of the Recipient Employees, they infringed on the plaintiffs' vested rights under the agreement.
 
 
 40
 Because we find that the plaintiffs have stated a cognizable claim under § 301, we reverse the district court's dismissal of that claim and remand the § 301 claim for further proceedings.
 
 V.
 
 41
 Finally, plaintiffs appeal the district court's dismissal of their state law claims for breach of contract and breach of fiduciary duty. Again, the district court provided no reason for its dismissal of the state claims. The safest assumption we can make is that the district court believed the state law claims were preempted by federal law. At least this is the theory that the plaintiffs understood from the district court's action, as the thrust of their argument to this court is that ERISA does not preempt state law claims for breach of contract and breach of fiduciary duty.
 
 
 42
 We need not resolve this question today, as we are persuaded by two compelling arguments asserted by defendants. First, even assuming ERISA posed no bar to related state law claims, the LMRA does. See, e.g., United Steelworkers of America v. Rawson, 495 U.S. 362, 368, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) ("any state law cause of action for violation of collective-bargaining agreements is entirely displaced by federal law under § 301"); Lingle v. Norge Div. Of Magic Chef, Inc., 486 U.S. 399, 405-06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) ("if the resolution of a state-law claim depends on the meaning of a collective bargaining agreement, the application of state law ... is preempted").
 
 
 43
 Second, defendants argue that plaintiffs waived their state law claims in the district court by failing to present any opposition to defendants with regards to the state law claims. See FDIC v. Binion, 953 F.2d 1013, 1018 (6th Cir.1991) (defendant waived any objections to appellate court when she failed to respond to plaintiff's motion in the district court). We find defendants' point meritorious. That the plaintiffs failed in this appeal to respond to the waiver argument in their reply brief only underscores the point.
 
 VI.
 
 44
 Reiterating our disapproval of the district court's cursory dismissal of this case, we REVERSE and REMAND plaintiffs' LMRA claim to the district court for further proceedings. With regard to the ERISA and state claims, we agree that the district court reached the correct result.
 
 
 
 [1]
 The original lead plaintiff, Thomas C. Williams, withdrew from the case after it was filed in the district court
 
 
 [2]
 In the district court, the defendants argued and the district court agreed that it would be proper for the court to consider the Memorandum Agreement in determining whether plaintiffs had stated a claim under Fed.R.Civ.P. 12(b), since the Memorandum Agreement was essentially a part of the pleading itself. See, e.g., Weiner v. Klais and Company, Inc., 108 F.3d 86, 88 (6th Cir.1997) ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.")
 
 
 [3]
 The Dillingham test has been adopted by this court, see Thompson v. American Home Assurance Co., 95 F.3d 429, 435 (6th Cir.1996); International Resources v. New York Life Ins., 950 F.2d 294, 297 (6th Cir.1991), as well as every other circuit. See Cvelbar v. CBI Ill., Inc., 106 F.3d 1368, 1378 n. 14 (7th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 56, 139 L.Ed.2d 20 (1997); Kenney v. Roland Parson Contracting Corp., 28 F.3d 1254, 1257 (D.C.Cir.1994) (collecting cases)