*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0366p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JEFFREY KLIMAS, Individually and as a Class
Representative,

*Plaintiff-Appellant,*

*v.*

COMCAST CABLE COMMUNICATIONS, INC.,

*Defendant-Appellee.*

No. 03-2012

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-72054—Patrick J. Duggan, District Judge.

Argued: September 20, 2005

Decided and Filed: September 28, 2006

Before: DAUGHTREY, MOORE, and McKEAGUE, Circuit Judges.

---

## COUNSEL

---

**ARGUED:** Seth R. Lesser, LOCKS LAW FIRM, New York, New York, for Appellant. Jaime A. Bianchi, WHITE & CASE, Miami, Florida, for Appellee. **ON BRIEF:** Seth R. Lesser, LOCKS LAW FIRM, New York, New York, Steven E. Goren, GOREN, GOREN & HARRIS, Bingham Farms, Michigan, for Appellant. Jaime A. Bianchi, WHITE & CASE, Miami, Florida, Thomas J. Tallerico, J. Adam Behrendt, BODMAN, LONGLEY & DAHLING, Troy, Michigan, for Appellee.

---

## OPINION

---

MARTHA CRAIG DAUGHTREY, Circuit Judge. In this appeal, we are asked to review the district court's order dismissing a putative class-action challenge brought under § 551 (Protection of Subscriber Privacy) of the Cable Communications Policy Act of 1984 (the Cable Act), 47 U.S.C.A. §§ 521-561 (Supp. 2006). The dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6) was predicated upon the district court's determination that the plaintiff, Jeffrey Klimas, lacked standing to contest alleged violations of the privacy provisions in § 551(b) by defendant Comcast Cable Communications, Inc. (Comcast) in the operation of its broadband internet service. On appeal, the plaintiff alleges that the district court misconstrued the provisions of § 551(b) and failed to address the claims brought under the notice provisions of § 551(a).

1

We conclude that the complaint was properly subject to dismissal under Rule 12(b)(6), but for reasons other than the one identified by the district court.  The plain language of § 551(b) indicates that its prohibition against the "collection of personally identifiable information using [a] cable system" is not applicable to information collected from the operation of a broadband internet service, even when operated by a cable company such as Comcast, because § 551(b), by its terms, applies only to a "cable system."  47 U.S.C.A. § 551(b),(b)(1).  Section 551(a) is broader, requiring notice of the collection of "personally identifiable information" to subscribers of "any cable service or *other service*,"  47 U.S.C.A. §  551(a)(1) (emphasis added), which arguably might cover broadband internet service.  However, subsection (a)(2)(B) confines "other service" to certain facilities "used in the provision of cable service," and subsection (a)(2)(A) excludes from the notice requirements "any record of aggregate data which does not identify particular persons."  47 U.S.C.A. § 551(a)(2)(A),(B).  There is no allegation that the information about internet activity collected in this case was actually correlated with subscriber lists so as to identify "particular persons."

For these reasons, as explained more fully below, we affirm the order of dismissal entered by the district court and the resulting judgment in favor of the defendant.

## I.  *FACTUAL AND PROCEDURAL BACKGROUND*

The dispute in this case involves the collection of information regarding internet protocol (IP) addresses and their linkage to universal resource locators (URLs) that facilitate use of the internet.  Any computer from which a person accesses the internet is assigned an IP address, which may be either "static" (remain constant) or  "dynamic" (change periodically).  When a URL, or website name, is typed into internet-browser software, a network of computers is able to connect to a corresponding IP address, permitting the transmission by internet of various types of information between the two addresses.  Internet service providers (ISPs) have the capacity to maintain databases containing a history of the linkages created by such transmissions.

On February 13, 2002, the president of Comcast Cable Communications, Inc., released a statement regarding the privacy of the company's subscribers, which read, in part:  "Since we launched our own Internet network six weeks ago . . . IP and URL information has been stored temporarily.  This information has never been connected to individual subscribers and has been purged automatically to protect subscriber privacy.  Beginning immediately, we will stop storing this individual customer information in order to completely reassure our customers that the privacy of their information is secure."  The statement also indicated that Comcast had reviewed information "in aggregate form only for purposes of network performance management to ensure an optimal Internet network experience for our subscribers."

Two months later, the plaintiff filed a class action in federal court seeking damages for violation of the Cable Act.  The complaint, as amended, charged that Comcast had violated § 551(b) "by collecting personally identifiable information concerning subscribers.  For example, Comcast linked the internet protocol of Plaintiff Jeffrey Klimas . . . with the URL of websites [he] visited, and otherwise tracked the internet surfing activities of its broadband internet subscribers."

In response to the defendant's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the plaintiff filed a second amended complaint, in which he claimed that the defendant had "kept a database which stored where each of its individual subscribers went on the Internet, and what each was doing"; that the information the defendant collected included "personally identifiable information sent to and from its Internet subscribers, including their Web surfing habits, where they visited, information they provided at Web sites and the like"; that the Comcast database "stored the history of [IP-URL] links and also, as a consequence, the information of what its subscribers viewed, did and entered at the Web sites they visited"; and that the defendant had "a list of every Web site its Internet subscribers had visited, as

well as the power to connect and correlate those online activities with the identity of each subscriber." The complaint also alleged that the defendant had information from which it could identify its subscribers, but *not* that the defendant had actually correlated the IP-URL linkages with the subscriber list. The plaintiff also alleged that "IP addresses are often 'dynamic' – a cable operator might assign . . . a different IP address after a certain number of hours, days, or weeks." In addition, the complaint also alleged other violations of the Cable Act, including failure to give proper notice of collection and storage of the information, failure to destroy the information when it was no longer necessary, and failure to make the information available for subscriber inspection, all of which is regulated under § 551(a).

In a renewed motion to dismiss, the defendant asserted that the plaintiff lacked standing to bring a Cable Act challenge because the injury alleged was hypothetical and not actual, noting that the complaint described two separate databases – one in which Comcast had stored its subscribers' IP-URL linkages and another in which the company maintained the personal information (names and addresses) that corresponded to given IP addresses. The flaw in the plaintiff's theory of recovery, according to Comcast, was the lack of any claim that Comcast had ever correlated these two databases.

At a hearing on the motion to dismiss, the district court was influenced not only by Comcast's argument, but also by the allegation in the plaintiff's complaint that "IP addresses are often 'dynamic'," pressing both sides for an explanation of the extent to which subscribers' contact information is revealed in their IP addresses and under what circumstances and how frequently IP addresses change.[1] In an ensuing opinion and order dismissing the case, the district court reasoned that "because the [personally identifiable information] part of Plaintiff's claim stems from Comcast collecting information about IP-URL links, the dispositive issue . . . is whether an IP address is [personally identifiable information] under the Cable Act," which the plaintiff had conceded was the controlling question during oral argument in the district court. Characterizing the basis for dismissal as a lack of standing on the part of the plaintiff, the district court ruled that "a dynamic IP address cannot constitute [personally identifiable information]" because "[d]ynamic IP addresses constantly change and unless an IP address is correlated to some other information, such as Comcast's log of IP addresses assigned to its subscribers . . . , it does not identify any single subscriber by itself. In other words, an IP address, by itself, is not 'specific information about the subscriber.'" In so ruling, however, the district court failed to acknowledge that not all IP addresses are dynamic, nor did the court rule on the remainder of the plaintiff's claims. This appeal followed.

## II. *DISCUSSION*

### A. *Standard of Review*

We review *de novo* the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 602 (6th Cir. 1999). Dismissal is appropriate only when it appears "beyond doubt that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief," after construing the complaint in the light most favorable to the plaintiff and accepting as true the factual allegations. *Id.* (internal quotation marks and citation omitted).

---

[1]The plaintiff analogized the collection of IP-URL linkages to a phone company recording the receiving telephone number and content of all of a person's outgoing phone calls or the post office keeping a file of photocopies of all mail coming from or going to a specific street address. The defendant offered a counter analogy of a library with closed stacks: a patron submits the titles she wants and is given a number; when the librarian has retrieved the books, he calls the number, delivers the books, and then puts the number back into a pool to be used again. It is not clear to us that any of these analogies is apt.

**B.** *Dismissal for Lack of Standing*

In the more than 20 years since Congress passed the Cable Act in 1984, the statute has remained largely unamended. The section invoked in this litigation, 47 U.S.C.A. § 551, provides measures to protect the privacy of cable subscribers. Specifically, subsection (b) prohibits cable operators from using cable systems to collect "personally identifiable information" about subscribers. 47 U.S.C.A. § 551(b). Specifically, it provides:

> (1) Except as provided in paragraph (2), a cable operator shall not use the cable system to collect personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned.

> (2) A cable operator may use the cable system to collect such information in order to -

>> (A)   obtain information necessary to render a cable service or other service provided by the cable operator to the subscriber; or

>> (B)  detect unauthorized reception of cable communications.

*Id.* The phrase "personally identifiable information" is not defined in the statute except in the negative. The term "does not include any record of aggregate data which does not identify particular persons." 47 U.S.C.A. § 551(a)(2)(A).

It was perhaps this provision that led the district court to the conclusion that the plaintiff lacked standing to bring this action, despite the language of § 551(f) that explicitly permits cable subscribers to bring a civil action to enforce the privacy measures. Of course, "[i]n order to establish the injury in fact element of standing, the plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct." *Kardules v. City of Columbus*, 95 F.3d 1335, 1347 (6th Cir. 1996) (internal quotation marks and citation omitted). "Put another way, the injury must be both concrete and particularized, meaning that the injury must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks and citation omitted). Furthermore, the injury may not be "the product of speculation or conjecture." *Id.* at 1348. The district court reasoned that because the plaintiff did not allege that the defendant had ever reconciled collected IP-URL linkages with subscribers' names, any claim that the information collected was "personally identifiable" was speculative, and the plaintiff therefore had no standing to bring suit for a violation of the Act's privacy provisions.[2]

After a study of the relevant provisions of § 551, we conclude to the contrary and hold that in light of subsection (f), the plaintiff's allegation that the defendant improperly collected IP-URL linkage information, taken as true, ostensibly alleged an injury under subsection (b). The district court's determination that the complaint was inadequate because it alleged that the information about subscribers was based on IP addresses, but did not allege correlation of those addresses to individual subscribers' names is, in our judgment, better analyzed not as a lack of standing, but rather as the lack of a well-pleaded § 551(b) claim.

---

[2]The district court also noted as part of its standing analysis that dynamic IP addresses are not in and of themselves personally identifiable information because, "[u]nlike a subscriber's name, address, social security number, etc., a dynamic IP address is constantly changing." However, in basing the dismissal on the dynamic nature of the IP addresses, the court overlooked the fact that not all IP addresses are dynamic and that the complaint did not allege that such was the case. We pretermit discussion of this factor as irrelevant. We further note that IP addresses do not in and of themselves reveal "a subscriber's name, address, [or] social security number." That information can only be gleaned if a list of individual subscribers is matched up with a list of their individual IP addresses.

## C.  *Failure to State a Claim*

We conclude that a reading of the plain language of § 551(b) precludes its application to broadband internet service.  The plaintiff pleaded in his second amended complaint that the defendant was a "cable operator" that provided cable service over a "cable system," an apparently accurate statement.  But, because the plaintiff alleged that the defendant collected personally identifiable information from subscribers' *internet* use, as opposed to their use of the defendant's cable service, the statute does not provide a cause of action.  Even though the ISP in this dispute is also a cable service provider, the collection of the data in this case had nothing whatever to do with Comcast's cable service or with information regarding its cable subscribers.  It follows that the defendant did not run afoul of the prohibition in § 551(b)(1) against a "cable operator" using a "cable system" to "collect personally identifiable information" concerning subscribers. 47 U.S.C.A. § 551(b)(1).  Put simply, what is at issue in this case is broadband internet access, not cable service.  Moreover, a series of recent decisions has made clear that, however uncertain federal regulation of broadband service via cable may still be, broadband internet service delivered via cable is *not* "cable service."

In the first of these cases, *AT&T v. City of Portland*, 216 F.3d 871 (9th Cir. 2000), the Court of Appeals for the Ninth Circuit considered a challenge to a local franchising authority's requirement that a cable operator grant all internet service providers unrestricted access to its cable broadband transmission facilities in order for it to receive a cable franchise.[3]  The court looked at the section of the Cable Act governing cable franchises and ruled that it applied to the provision of cable service only, not broadband internet service.  Working from the definition of "cable service" provided in § 522(6), the appellate court held:

> The essence of cable service . . . is one-way transmission of programming to subscribers generally. . .  Internet access is not one-way and general, but interactive and individual beyond the 'subscriber interaction' contemplated by the statute.  Accessing Web pages, navigating the Web's hypertext links, corresponding via e-mail, and participating in live chat groups involve two-way communication and information exchange unmatched by the act of electing to receive a one-way transmission of cable or pay-per-view television programming.  And unlike transmission of a cable television signal, communication with a Web site involves a series of connections involving two-way information exchange and storage, even when a user views seemingly static content.  Thus, the communication concepts are distinct in both a practical and a technical sense.  Surfing cable channels is one thing; surfing the Internet over a cable broadband connection is quite another.

216 F.3d at 876-77.

The court then articulated a two-prong definition for internet service provided by cable operators' proprietary internet service providers.  It first noted that the Federal Communications Commission had defined conventional internet service as an "information service." *Id.* at 877, 878.  According to the Communications Act of 1934, as amended, such a service is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making

---

[3]It is worth noting that this case concerned cable broadband internet service to be provided by Excite@Home. *See City of Portland*, 216 F.3d at 874.  This company was founded by a consortium of cable operators that included the defendant, Comcast. *See In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 F.C.C.R. 4798, 4812 (2002).  In September 2001, Excite@Home filed for Chapter 11 bankruptcy protection and was forced to liquidate its assets. *Id.* at 4817.  Comcast participated in an agreement with Excite@Home and other affiliated cable operators whereby Excite@Home continued to provide internet service until February 28, 2002, when Comcast and the other cable operators transitioned subscribers to their own high-speed networks. *Id.* at n.122.  The actions that the plaintiff alleges that the defendant took in this case occurred in the wake of Excite@Home's bankruptcy liquidation.

available information via telecommunications." 47 U.S.C.A. § 153(20). Relying on this F.C.C. classification of conventional ISPs, the appellate court recognized that such ISPs offer their service by leasing access to phone lines over which subscribers access the ISPs' point of presence on the internet (commonly referred to as "dial-up connection" or DSL[4] ). Thus, conventional ISPs provide an information service only by means of *another* operator's telecommunications equipment, but do not actually provide any telecommunications service. However, proprietary cable operator ISPs control the cable lines between their internet points of presence and their subscribers' computers. Thus, according to the Ninth Circuit, they also provide telecommunications service:

> [U]nlike other ISPs, @Home controls all of the transmission facilities between its subscribers and the Internet. To the extent @Home is a conventional ISP, its activities are that of an information service. However, to the extent that @Home provides its subscribers Internet transmission over its cable broadband facility, it is providing a telecommunications service as defined in the Communications Act.

*City of Portland*, 216 F.3d at 878. "Telecommunications service" is defined by the Communications Act as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C.A. § 153(46). In turn, "telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C.A. § 153(43).

In reaching both these decisions about cable internet service, the court noted that although the F.C.C. was empowered to decide the issue, it had not spoken and so the court was not required to afford deference to any Commission ruling. The court expressly observed that "the FCC has declined, both in its regulatory capacity and as *amicus curiae*, to address the issue before us. Thus, we are not presented with a case involving potential deference to an administrative agency's statutory construction pursuant to the *Chevron* doctrine." *City of Portland*, 216 F.3d at 876.

Three months after the *City of Portland* decision, the F.C.C. issued a Notice of Inquiry to determine "what regulatory treatment, if any, should be accorded to cable modem service and the cable modem platform used in providing this service." *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 15 F.C.C.R. 19287 (2000). Two years later, the Commission issued a ruling in which it concluded that "cable modem service, as it is currently offered, is properly classified as an interstate information service, not as a cable service" with "no separate offering of telecommunications service." *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 F.C.C.R. 4798, 4802 (2002). This ruling contradicted *City of Portland* to the extent that it did not classify cable internet service as a telecommunications service.

Following the F.C.C.'s ruling, seven petitions for its review were filed among the Third, Ninth and District of Columbia Circuits. *Brand X Internet Servs. v. F.C.C.*, 345 F.3d 1120, 1127 (9th Cir. 2003). The petitions challenged the ruling on one of three grounds: that it should have also found that cable internet service is a telecommunications service and therefore subject to regulation as a common carrier; that the service is also cable service and therefore subject to regulation under the Cable Act; or that the ruling should also have applied to DSL internet service provided by telephone companies. *Id.* The petitions were transferred to the Ninth Circuit for consolidation.

In a *per curiam* opinion, the court of appeals rejected the F.C.C.'s ruling to the extent that it was inconsistent with the decision in *City of Portland*. *Brand X Internet Servs.*, 345 F.3d at 1132.

---

[4]DSL stands for "digital subscriber line." It is a means of offering broadband internet access over existing phone lines by using a different signal spectrum. *See Inquiry Concerning High Speed Access*, 17 F.C.C.R. at 4803.

Citing *United States v. Camper*, 66 F.3d 229, 232 (9th Cir. 1995), the court held that it was bound to adhere to its earlier decision and that only if the earlier decision had deferred to an agency ruling could the court adopt the intervening agency interpretation. 345 F.3d at 1130-31 ("If the precedent held either that the [agency] decision was unreasonable or the only possible interpretation of the statute, then the prior court's construction trumps the agency's interpretation." (internal quotation marks and citation omitted) (alteration in original)). One judge, writing separately, did note the conflicted nature of the decision. *See* 345 F.3d at 1132 ("I write separately to note that our adherence to *stare decisis*, even in the face of a subsequent agency interpretation contrary to our *Portland* decision, produces a result strikingly inconsistent with *Chevron*'s underlying principles.") (O'Scannlain, J., concurring) (internal quotation marks and citation omitted).

The Supreme Court then granted *certiorari* to resolve the tension inherent between the two Ninth Circuit decisions, certifying two questions: Was the F.C.C.'s decision entitled to deference under the *Chevron* doctrine? Did the court of appeals err in holding that the F.C.C. had impermissibly concluded that cable modem service is "information service," without a separately regulated telecommunications service component? *See Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 543 U.S. 1018 (2004). In the resulting opinion, *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), the Court held that the F.C.C.'s ruling that cable internet is an information service and not a telecommunications service was a lawful construct of the Communications Act under the aegis of the *Chevron* decision.

This series of decisions fully supports our reading of the statute as providing no basis for a cause of action under the facts of this case. Section 551(b), as written, prohibits cable operators from using cable systems to collect personally identifiable information. But "cable systems" do not deliver the "information service" that is provided by internet access. Both the Ninth Circuit and the F.C.C. agreed, and they are surely correct, that internet service is a two-way process. *See City of Portland*, 216 F.3d at 876-77 ("communication with a Web site involves a series of connections involving two-way information exchange and storage"); *Inquiry Concerning High-Speed Access*, 17 F.C.C.R. at 4809 ("Internet connectivity functions enable cable modem service subscribers to transmit data communications *to and from* the rest of the Internet") (emphasis added). A user's computer seeks out a URL that, in response, sends the information on a selected web page back to the computer. This is an essential aspect of any on-line activity, whether it is web-surfing, emailing, e-commerce, downloading music or video, or updating a personal web page. By contrast, "cable service" as defined in the statute is clearly a one-way process, from cable operator to subscriber. *See Inquiry Concerning High-Speed Access*, 17 F.C.C.R. at 4833 ("The phrase 'one-way transmission to subscribers' . . . reflects the traditional view of cable as primarily a medium of mass communication, with the same package or packages of video programming transmitted from the cable operator and available to all subscribers.")

This construction is reinforced by the F.C.C.'s description of systems designed to provide cable modem service:

> Cable systems were originally built to provide video programming service in one direction, from the network to subscribers. . . . Cable operators have had to invest in *major improvements or system upgrades to provide cable modem service*. . . . *Cable modem service requires special equipment* at the headend and in other parts of the cable system. Often located at the headend is a Cable Modem Termination System ("CMTS"), which . . . enables the *enhanced two-way capabilities essential for cable modem service*.

*Id.* at 4807 (emphasis added). The systems that deliver internet access to subscribers are not those that § 551(b) addresses. Hence, because the plaintiff alleged that the defendant collected personally identifiable information by means of a system through which it provided internet service, instead of

cable service, the complaint did not state a claim under § 551(b) for violation of subscriber privacy, and it was therefore properly dismissed under Rule 12(b)(6).

We likewise find that the complaint fails to state a claim under § 551(a), which requires written notice by a "cable operator" to the subscriber of "any cable service or other service" of the "nature of personally identifiable information collected or to be collected with respect to the subscriber and the nature of the use of such information," as well as information concerning how long the data will be maintained and to whom it will be disclosed. 47 U.S.C.A. § 551(a)(1). We think it is clear from the above analysis that the term "other service," although broad, was not intended to apply to broadband internet service, which did not exist at the time that the Cable Act was passed. This conclusion is supported by language in subsection (2)(B) that defines "other service" to include "any wire or radio communications service provided using any of the facilities of a cable operator that are used in the *provision of cable service*." 47 U.S.C.A. § 551(a)(2)(B) (emphasis added). As we have today held, "cable service" does not include broadband internet service, even when provided by a "cable operator." But even if the term "other service" could somehow be interpreted to extend to internet service, there is an exclusion in § 551(a)(2)(A) providing that "the term 'personally identifiable information' does not include any record of aggregate data which does not identify particular persons." 47 U.S.C.A. § 551(a)(2)(A). The only record containing the identity of "particular persons" mentioned in the complaint, as noted above, is the list of Comcast internet service subscribers, which – standing alone – obviously is not covered by the Act. We therefore conclude that the complaint fails to state a claim under § 551(a).

### III. *CONCLUSION*

For the reasons set out above, we AFFIRM the judgment of the district court.