Samantha SISTRUNK, Plaintiff–Appellant,

v.

CITY OF STRONGSVILLE and Bush–Quayle '92 Committee, Inc., Defendants–Appellees.

No. 95–3067.

United States Court of Appeals, Sixth Circuit.

Argued March 18, 1996.

Decided Oct. 29, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 2, 1997.*

* Judge Spiegel would grant rehearing for the reasons stated in his dissent.

David J. Hooker, Daniel R. Warren (argued and briefed), Elizabeth A. Costigan, Nicolle M. Clessuras (briefed), Thompson, Hine & Flory, Cleveland, OH, for Plaintiff–Appellant.

John T. McLandrich, Mazanec, Raskin & Ryder (argued and briefed), Cleveland, OH, for Defendant–Appellee City of Strongsville.

Bobby R. Burchfield, Covington & Burling (argued and briefed), Washington, DC, Patrick M. Foy, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, for Defendant–Appellee Bush–Quayle '92 Committee, Inc.

Alfred R. Cowger, Jr., Alcan Aluminum Corp. (briefed), Mayfield Heights, OH, William M. Saks, American Civil Liberties Union of Ohio Foundation (briefed), Cleveland, OH, for amici curiae H. Paul Schwitzgebel and James E. Delong.

John E. Gotherman, Malcolm C. Douglas (briefed), Columbus, OH, for amicus curiae Ohio Municipal League.

Before: NELSON and RYAN, Circuit Judges; SPIEGEL, District Judge.**

RYAN, J., delivered the opinion of the court, in which NELSON, J., joined. SPIEGEL, D.J. (pp. 200–203), delivered a separate dissenting opinion.

RYAN, Circuit Judge.

Plaintiff Samantha Sistrunk appeals the judgment for defendants in this action under 42 U.S.C. § 1983 and Ohio law, challenging the defendants' exclusion of all speech opposing then-President George Bush's reelection at a political rally held on public property. Plaintiff argues that the City of Strongsville,

** The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

Ohio, violated her free speech rights by permitting the Bush–Quayle '92 Committee to exclude members of the public from a traditional public forum based on the content of their speech. Plaintiff further argues that the committee acted under color of state law or as a state actor when it denied plaintiff access to the Strongsville Commons.

We conclude that neither the city nor the committee violated plaintiff's constitutional rights even if she was excluded from the Commons because of the content of her speech. Because we find that the plaintiff has not alleged a violation of her free speech rights, we have no occasion to address whether her exclusion from the Commons was state action. We therefore affirm the district court's dismissal for failure to state a claim.

## I.

The Strongsville Republican Organization obtained a permit from the city to use certain municipal property, including the Strongsville Commons, for a political rally to be held on October 28, 1992, from 8:30 a.m. to 4:30 p.m. According to the complaint, the Strongsville Republican Organization either permitted or joined with the Bush–Quayle '92 Committee to use the Commons to hold a rally for then-President George Bush. Walter Ehrnfelt, the city's mayor, issued the permit to the applicant organization for the nominal fee of $1. The permit provided that the permittee organization would be entitled to use and/or rent designated offices and chambers of the municipal building and its grounds, including the Commons and the gazebo, for the purposes of receiving and welcoming President Bush and celebrating his visit to the city. The permit specifically provided that the use of the facilities and grounds was limited to the members of the organization and their invitees. The permit also provided that the committee was authorized to further restrict the use of the premises by category of invitation. To attend the rally, members of the public were required to obtain admission tickets, which were available at city hall free of charge on a first come, first served basis.

Plaintiff alleged that the Commons is a public forum, that it is located in the center of the city, that it was dedicated by the city's founder to the inhabitants of Strongsville for exclusive use as a public common area, and that for the last 165 years "countless public gatherings and festivals have been held on the Commons, including community art fairs and amusement and entertainment events, as well as Strongsville's 'Community Day.'" Pursuant to a city ordinance, the mayor's office has the authority to regulate the use of the Commons; any person or organization wishing to use the Commons must apply to the mayor's office for permission.

The committee prohibited rally participants from carrying or displaying signs or buttons that carried messages critical of President Bush; however, it allowed participants to display approved signs and buttons which carried messages either supporting the President or neutral to his support. Plaintiff, a high school student at that time, obtained a ticket to the rally and was transported to the rally on a bus provided by the Strongsville public school system. Plaintiff wore several buttons on her jacket—a picture of a classmate, a red ribbon drug-free pin, and a political button endorsing Bill Clinton for President. Plaintiff was stopped outside the rally entrance by a committee official who told her that she could not carry or display the Bill Clinton button inside the rally. The official did not object to any of the other buttons plaintiff wore. Plaintiff relinquished her Bill Clinton button to the committee official before entering the rally.

When confronted with questions after the rally about the committee's activities in suppressing opposing speech, Strongsville's chief of police was quoted as saying that the committee was entitled to exclude ticket holders from the rally on the basis of speech content because the property had been leased for the day by the committee. Plaintiff claims that this response indicates that the city had knowledge beforehand of the committee's intention to exclude from the Commons political expression that was not supportive of President Bush and that the city had adopted a policy beforehand that caused the deprivation of free speech rights in a public forum.

. Plaintiff alleged that a symbiotic relationship existed between the city and the committee, such that the committee's activities in holding the rally can be treated as those of the city itself. In support of this proposition, plaintiff made the following allegations: The city's chief official, Mayor Ehrnfelt, helped organize the rally. The tickets indicated that Mayor Ehrnfelt was a sponsor of the event, stating: "Mayor Walter F. Ehrnfelt and the Republican Party invite you to see and hear President George Bush and the Oakridge Boys at Strongsville Commons Wednesday, October 28, 1992." At the bottom of the tickets appeared the printed statement: "paid for by Bush–Quayle '92 Election Committee, Inc." Among the other political literature disseminated to the public at city hall was an advertisement stating: "Mayor Walter F. Ehrnfelt invites you to come and see ... President George Bush," below which the advertisement stated: "Send the media a message that we will win!!!" The city openly encouraged citizens to attend the rally and facilitated the distribution of tickets to the public by allowing tickets to be distributed from Strongsville City Hall. Officials of the city, including the mayor himself, actually took part in the rally. The mayor was present on the gazebo on which President Bush and celebrities who publicly endorsed the President's candidacy were seated during the rally. A banner was prominently displayed on the gazebo declaring "Strongsville Trusts George Bush." The Strongsville public schools encouraged local students to attend the rally by offering students the option of attending the rally instead of their regularly scheduled classes, and by providing students with free transportation to the rally on city school buses. Additionally, the Strongsville High School marching band performed at the rally. Finally, the city provided police protection and other municipal services for the rally.

The district court found that the complaint failed to state a claim against either the city or the committee because the city's involvement in the rally was largely passive and wholly diverse from the committee's actions. The district court therefore concluded that the challenged private conduct was not attributable to the state for the purposes of a 42 U.S.C. § 1983 action. The district court also found that plaintiff had failed to state a claim under the Ohio constitution because the protections provided her under the Ohio constitution extended no farther than the protections accorded her under the First Amendment to the United States Constitution.

**II.**

■ Determining whether the district court properly dismissed a claim is a question of law subject to *de novo* review. *See Mertik v. Blalock,* 983 F.2d 1353, 1356 (6th Cir.1993). In conducting this review, we "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994). A motion to dismiss may be granted under Fed.R.Civ.P. 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

The First Amendment as applied to the states through the Fourteenth Amendment provides that the government "shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

■ Although, as the dissent observes, we do not ordinarily decide constitutional issues if a case can be resolved on non-constitutional grounds, we think it is appropriate, for two reasons, in this case to proceed directly to the First Amendment issue: 1) as the dissent correctly suggests, the state action question has not been "sufficiently developed" on the record below; and 2) to remand for development of an incompletely presented issue in the hope of finding a non-constitutional basis for deciding this case later on, when we presently confront a clearly framed constitutional question, would seem to be an imprudent waste of time and judicial resources.

■ Plaintiff argues that the city violated her free speech rights by permitting the

committee to exclude members of the public from the rally on the Commons based on the content of their speech. We assume for the purposes of addressing this argument that the plaintiff has alleged sufficient facts to establish at this preliminary stage of the case that the city did authorize the committee to exclude members of the public who sought to express opposition to the reelection of President Bush. Plaintiff argues that the city could not constitutionally authorize a private entity to admit or exclude ticket holders from the rally based on the content of their speech. More specifically, plaintiff argues that 1) the city *did not* convert the Commons to nonpublic status, 2) the city *could not* convert the Commons to nonpublic status, and 3) the viewpoint-based restriction imposed on her speech would be unconstitutional even in a *nonpublic forum.*

Plaintiff claims that Supreme Court precedent establishes that a municipal government does not have the power to convert a traditional public forum into nonpublic property to forbid access to that property for expressive purposes. Plaintiff relies heavily on the fact that the Supreme Court struck down a federal statute that attempted to restrict expressive activity in front of the Supreme Court building by converting a sidewalk, a traditional public forum, into nonpublic government property from which speech could be prohibited entirely. *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). This statute was ruled unconstitutional on the basis that "Congress ... may not by its own *ipse dixit* destroy the public forum status of streets and parks which have historically been public forums." *Id.* at 180, 103 S.Ct. at 1708 (internal quotation marks and citation omitted).

Plaintiff argues that even if the Commons were a nonpublic forum, the city could not authorize a private entity to exclude members of the public on the basis of the content of their speech. The Supreme Court has held that access to a nonpublic forum may be limited by the government only "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)).

The law cited by plaintiff may prohibit the City of Strongsville from denying any access to the Commons for expressive activity and from granting or denying permits based on the content of an applicant's speech, but it does not prohibit the city from issuing permits to groups seeking to make exclusive use of the Commons for expressive activity during a limited period of time. In fact, a recent Supreme Court case suggests that the city may not constitutionally require a permittee organization to *include* discordant speakers in its expressive activity.

In *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), the Court held that the state could not require private citizens who organized a parade through public streets to include among the marchers a group imparting a message the organizers did not wish to convey. *Id.* at —— ——, 115 S.Ct. at 2340–41. *Hurley* does not control the case before us because, in *Hurley,* (1) only the parade council, not the interposing group, presented the Supreme Court with a First Amendment claim, and (2) the interposing group abandoned its argument that the council's conduct was not purely private but had the character of state action. However, the similarity between the facts in *Hurley* and the facts in the present case strongly suggests that the city could not have required the committee to include in the rally persons imparting a message that the committee did not wish to convey.

In *Hurley,* the South Boston Allied War Veterans Council applied for and received a permit to hold a parade on public streets. A group of gay, lesbian, and bisexual Irish immigrants (GLIB) joined together with other supporters to form a marching unit within that parade. After the council refused to admit GLIB to the upcoming parade, GLIB filed a suit alleging violations of the state and federal constitutions, and of the state's public accommodations law, which prohibited discrimination in public accommodations on ac-

count of sexual orientation. GLIB won at the state trial court and appellate court levels, however, the Supreme Court ruled that a state requirement "to admit a parade contingent expressing a message not of the private organizers' own choosing violates the First Amendment." *Id.* at ——, 115 S.Ct. at 2343.

The *Hurley* Court determined that a parade is intended to make a collective point, and thus is a form of expression, and that GLIB's proposed participation as a unit in the parade was equally expressive. *Id.* at —— – ——, 115 S.Ct. at 2345–46. The Supreme Court held that " '[s]ince *all* speech inherently involves choices of what to say and what to leave unsaid' ... one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.' " *Id.* at ——, 115 S.Ct. at 2347 (quoting *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California,* 475 U.S. 1, 11, 16, 106 S.Ct. 903, 909, 911, 89 L.Ed.2d 1 (1986) (plurality opinion)). The Court noted that the state generally "may not compel affirmance of a belief with which the speaker disagrees." *Id.* If the rule were otherwise, the government could freely compel " 'speakers to propound political messages with which they disagree,' " and " 'the government could require speakers to affirm in one breath that which they deny in the next.' " *Id.* at ——, 115 S.Ct. at 2348 (quoting *Pacific Gas & Elec. Co.,* 475 U.S. at 16, 106 S.Ct. at 911).

The City of Strongsville appropriately granted permission to the committee to engage in expressive activity in the Commons just as Boston appropriately granted permission to the veterans council to engage in expressive activity on the public streets. A public rally is speech to the same extent that a parade is speech. The committee here did not seek merely to assemble and "stand around," any more than the parade organizers sought merely to reach a particular destination. As the *Hurley* Court recognized, the collective point conveyed to the audience is so essential to the parade that " 'if a parade or demonstration receives no media coverage, it may as well not have happened.' " *Id.* at ——, 115 S.Ct. at 2345 (citation omitted). Similarly, the organizers of the Bush–Quayle rally sought to assemble in order to convey a pro-Bush message to the media by use of pro-Bush speakers and largely pro-Bush attendees. The committee expressly sought to attract attendance in order to "send the media a message" that Bush would win; to convey the message that "Strongsville Trusts George Bush."

Plaintiff has not alleged any content-based exclusion in the permit application process; that is, plaintiff did not allege that she applied for permission to hold a rally for her own expressive purposes in the Commons and was denied permission on the basis of the content of her views. Plaintiff's only claim is that she was not permitted to participate *in the committee's speech* while expressing her own discordant views. To require that the organizers include buttons and signs for Bill Clinton in the demonstration would alter the message the organizers sent to the media and other observers, even if the holders of signs and wearers of buttons did not otherwise interfere with the pro-Bush rally. Just as the organizers of the parade could not be compelled to include in their message the discordant message of GLIB, the committee that organized the rally for George Bush could not be compelled to include in its message an expression of confidence in Clinton.

The plaintiff could have held a pro-Clinton rally on another day just as GLIB could have held its own parade at another time. The plaintiff could have stood with her button on the sidewalk leading up to the rally to express her support for Clinton, just as GLIB could have lined the streets with other nonparticipating members of the public to watch the parade and convey from the sidewalks their distinct message. It was suggested at oral argument that the parallel to expressing disapproval of the parade from the sidewalks would be attending the rally as a member of the rally's audience in the Commons. However, participating in the rally as a member of the audience is more akin to marching in the parade itself as one of the less visible marchers. As the parade organizers had received permission to use the streets of Boston, but not the sidewalks, to convey their message, so the rally organizers had

received permission to use the Commons, but not the adjacent public sidewalks. Those seeking admission to the area that was covered by the permit—which area was reasonably necessary to the organizers' expressive activity and was restricted to the use of the organizers and their invitees—were in effect seeking inclusion in the expressive activity itself. For the city to require the committee to admit all ticket-holding members of the public seeking to express a message would amount to a rule of law stating that

> any contingent of protected individuals with a message would have the right to participate in [the Committee's] speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own. But this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.

*Hurley,* —— U.S. at ——, 115 S.Ct. at 2347.

Therefore, we conclude that even if plaintiff has alleged sufficient facts to establish that the city authorized the committee to exclude members of the public who sought to express a discordant message, plaintiff has not alleged that the city violated plaintiff's free speech rights; rather, plaintiff has only established that the city permitted the committee to exercise its free speech rights and autonomy over the content of its own message. There has been no constitutional violation and therefore there can be no liability on the part of the city or the committee. The district court properly dismissed this action.

### III.

For the foregoing reasons, we **AFFIRM** the district court's dismissal for failure to state a claim.

SPIEGEL, District Judge, dissenting.

Today, the majority concludes that neither the City of Strongsville nor the Bush–Quayle '94 Committee violated Ms. Sistrunk's constitutional rights. I believe the majority's decision is erroneous. Accordingly, I respectfully dissent.

First, the majority decides an issue that I believe is not before the Court. As a result, the majority unnecessarily resolves a constitutional question when this case was before the Court on the more mundane question of state action. Second, I believe the majority has misapplied the Supreme Court's holding in *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). In fact, the majority may have turned the narrow holding of *Hurley* on its head in order to defeat Ms. Sistrunk's First Amendment claim.

The United States Supreme Court generally follows a policy of avoiding unnecessary adjudication of constitutional issues. *United States v. National Treasury Employees Union,* —— U.S. ——, ——, 115 S.Ct. 1003, 1019, 130 L.Ed.2d 964 (1995) (citing *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). In *Ashwander,* Justice Brandeis identified numerous doctrines used by the Court to avoid needless adjudication of constitutional questions including standing, mootness and ripeness. For purposes of this appeal, Justice Brandeis' most important admonition was that the "Court will not pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander,* 297 U.S. at 347, 56 S.Ct. at 483 (Brandeis, J., concurring); *see also Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482 (1905) ("It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

The Supreme Court developed the abstention doctrines in order to prevent premature and unnecessary decisions on federal constitutional questions. *See Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 501–02, 61 S.Ct. 643, 645–46, 85 L.Ed. 971 (1941) (requiring courts to withhold decision on the unconstitutionality of state law until pending proceedings in state court can pro-

vide definitive construction of state statutes). The Court stressed that judicial restraint is even more important when a case presents an issue of social or political significance. "The complaint of the Pullman porters undoubtedly tendered a substantial constitutional issue. It is more than substantial. It touches a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open." *Id.* at 498, 61 S.Ct. at 644.

In this instance, the majority fails to follow the Supreme Court's guidance. The issue on appeal is strictly the jurisdictional question whether the conduct in question amounts to state action. A threshold hurdle in any 42 U.S.C. § 1983 action is a showing that the infringement resulted from conduct performed under the "color of state law." *See Hurley,* —— U.S. at ——, 115 S.Ct. at 2344 (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) ("[T]he guarantees of free speech and equal protection guard only against encroachment by the government and 'erec[t] no shield against merely private conduct'....")). Accordingly, a First Amendment ruling based upon *Hurley* is not only unnecessary, but premature since Ms. Sistrunk does not have a claim if she cannot show state action.

Second, the majority's application of *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), to this case is improper. In *Hurley,* plaintiffs, gay, lesbian and bisexual Irish–Americans, sought to be included in a parade sponsored by a veterans organization. The veterans argued that the application of Massachusetts' public accommodations law to compel participation by the gays in their parade violated the veterans' freedom of speech. The Supreme Court agreed and found the public accommodations law to be unconstitutional as applied in this context.

Although it recognizes that *Hurley* did not involve a First Amendment claim on the part of the plaintiffs, the majority finds the facts of the two cases so analogous as to "strongly suggest that the city could not have required the committee to include in the rally persons imparting a message that the committee did not wish to convey." This analysis is incorrect for several reasons. First, the factual context of the two cases is distinct enough to warrant deeper investigation before blind adherence to the conclusion in *Hurley.* Allowing Ms. Sistrunk to attend the rally with her button does not necessarily mean that she is participating in the rally. Second, the Court in *Hurley* appears to have limited the holding to its context and is completely inapplicable in this situation. Finally, the majority ignores the Supreme Court's and this Circuit's methodology for examining First Amendment claims involving public fora.

Unlike the gay marchers, Ms. Sistrunk did not seek to intrude upon the Committee's speech by participating in the proceedings. Instead, she wished to attend the rally, and at the same time, express her support for Mr. Clinton by wearing a button.

The majority equates Ms. Sistrunk's desire to attend the Bush–Quayle Rally with the gay's wish to march in the St. Patrick's Day Parade. The majority concludes that being a member of the rally's audience is akin to marching in the parade. I disagree. A marcher in the parade is an active participant in the event, while one in attendance at a political rally is merely a spectator. In actuality, marching in a parade is equivalent to speaking at a rally since both are involved in conveying the message.

On the other hand, the folks along a parade route or in a public square during a rally are the audience. The audience comprises those present who can see and hear the event.[1] In fact, both events are pointless without an audience.

The majority counters that Ms. Sistrunk "could have stood with her button on the sidewalk leading up to the rally to express her support for [President] Clinton...." Forcing an individual to stand outside the square would be like forbidding the gay Irish–Americans from standing on a street

---

1. Audience is a "group of spectators at a public event; listeners or viewers collectively, as in attendance at a theater, concert, or the like...."

The Random House Dictionary, unabridged edition (1979).

corner along the parade route. It is doubtful that the Supreme Court would find such action acceptable.

In addition to the factual distinctions, *Hurley*'s legal conclusions are also inapplicable in this situation. In *Hurley*, the Court held that First Amendment forbids a State from "compel[ling] affirmance of a belief with which the speaker disagrees." *Hurley*, ⎯ U.S. at ⎯, 115 S.Ct. at 2347. The question here is not whether the City can require action by the Bush–Quayle Committee, but rather, whether granting a private entity the power to exclude citizens from a traditional public forum based upon their viewpoint amounts to state action.

In *Hurley*, the plaintiffs fought exclusion from the St. Patrick's Day Parade as a violation of the Massachusetts public accommodations law. They, however, failed to argue that their First Amendment rights were violated by the exclusion. By contrast, Ms. Sistrunk argues that the First Amendment precludes the City and the Committee from excluding her from a traditional public forum based upon her viewpoint (i.e., wearing a political button). The balance struck in *Hurley* is between a state law · and the First Amendment. The Supreme Court had no difficulty finding that the Massachusetts public accommodations law must yield to the First Amendment rights of the Boston Veterans.

The conflict between the First Amendment rights of two individuals, however, is a much different and more · difficult inquiry. The Court did not address this issue in *Hurley*. On the other hand, the Court has only upheld viewpoint-based restrictions when the regulation is narrowly tailored to promote a compelling state interest. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

In a nearly identical factual situation, this Court developed a methodology for confronting the difficult issues presented here. *Bishop v. Reagan–Bush '84*, 1987 WL 35970, 1987 U.S.App. LEXIS 6669 (unpublished) (6th Cir. May 22, 1987). Although this case is unpublished, I believe it provides a helpful guide-

post and should have been followed in this instance.

In *Bishop*, the plaintiffs attempted to attend a political rally being held on Fountain Square in downtown Cincinnati. They carried signs critical of the Reagan Administration or its policies, but security confiscated the signs before allowing them to enter the square. The district court dismissed all claims finding that the City permit allowed the defendants to take whatever action they desired with Fountain Square. *Bishop v. Reagan–Bush '84 Committee*, 635 F.Supp. 1020 (S.D.Ohio 1986). This Court reversed. The proper inquiry starts with a determination of the type of forum involved. *Bishop*, 1987 WL 35970, at *3, 1987 U.S.App. 6669, at *6. Then, the trial court must determine if the City has the power to convert it into a private forum. *Id.* 1987 WL 35970, at *3, 1987 U.S.App. 6669, at *9. If so, the court must address the questions of state action and qualified immunity. *Id.* Finally, the court must decide if the limitations employed comport with reasonable time, place or manner regulations.

The fundamental question is how much control over a traditional public forum may a municipality cede to a private group. The Supreme Court has expressed a strong desire to protect public fora as an important safeguard of the First Amendment. *See e.g., Perry*, 460 U.S. at 45, 103 S.Ct. at 954 ("In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed."); *Schwitzgebel v. City of Strongsville*, 898 F.Supp. 1208, 1216 (N.D.Ohio 1995) ("In essence, public fora serve as bulwarks protecting the right of all persons, especially those who have no access to any other outlet, to speak their minds freely. Courts must not allow the government to overcome the bastions protecting such an important right through so simple an exercise as the granting of a permit."). The Sixth Circuit noted that there is "the possibility that the nature of certain public forums cannot be altered, either by government fiat or private will." *Bishop*, 1987 WL 35970, at *2, 1987 U.S.App. 6669, at *6.

In this case, the district court did not determine whether the City had the power to convert a public forum into a private forum through the use of a permit. *Compare Community for Creative Non-Violence v. Hodel,* 623 F.Supp. 528 (D.D.C.1985) (allowing government to convert an otherwise public forum into a non-public forum through the use of a permit) *with Irish Subcommittee v. Rhode Island Heritage Commission,* 646 F.Supp. 347 (D.R.I.1986) (holding government cannot change the essence of public forum). Instead, the district court determined that no state action existed. The record has not been sufficiently developed on either question. Accordingly, I would reverse and remand this case for further factual development of these issues.