*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0331P (6th Cir.)
File Name: 04a0331p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DOUGLAS R. PARKS,
    *Plaintiff-Appellee,*

    *v.*

RICHARD H. FINAN; RONALD
T. KELLER; KENNETH L.
MORCKEL; LEE A. DARDEN,
    *Defendants-Appellants.*

No. 03-3848

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00094—Gregory L. Frost, District Judge.

Argued: March 16, 2004

Decided and Filed: September 29, 2004

Before: ROGERS and COOK, Circuit Judges;
SCHWARZER, District Judge.*

_____

* The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

---

_____

### COUNSEL

**ARGUED:** Elise W. Porter, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellants. Nathan W. Kellum, Memphis, Tennessee, for Appellee. **ON BRIEF:** Elise W. Porter, Tomi L. Dorris, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellants. Nathan W. Kellum, Memphis, Tennessee, for Appellee.

ROGERS, J., delivered the opinion of the court, in which SCHWARZER, D. J., joined. COOK, J. (pp. 23-25), delivered a separate dissenting opinion.

_____

### OPINION

_____

ROGERS, Circuit Judge. On two separate occasions in April 2002, Douglas Parks entered the grounds of the Ohio state capitol and attempted to preach a Christian message—the first time by preaching, the second time by wearing a sandwich board and distributing leaflets. Both times Ohio State Highway Patrol ("OSHP") troopers informed Parks that he was required to obtain a permit prior to conducting these activities on the Capitol Square and asked Parks to leave. After the second of these encounters, Parks instituted this action in the district court, seeking an injunction preventing the Capitol Square Review and Advisory Board ("CSRAB") and OSHP from enforcing the permit requirement against him.[1] The district court, finding

---

[1] The defendants are the CSRAB chairman, its executive director, and various members of the Ohio State Highway Patrol. For convenience when speaking of the defendant officials as litigants on this appeal, we refer to them as CSRAB.

the permitting scheme deficient in many respects under the First Amendment, permanently enjoined CSRAB from enforcing the permitting scheme against individual speakers. We construe the injunction to apply only to the application of the permitting scheme to individuals who are not acting as part of a group or in concert, and we affirm on grounds more limited than those relied upon by the district court.

## I

Ohio's Capitol Square consists of the state capitol buildings and the surrounding Capitol grounds, a ten-acre area bounded on all sides by city streets. *See* Ohio Rev. Code Ann. § 105.41(L) (Anderson 2001) (amended 2002); Ohio Admin. Code (OAC) § 128-4-01(B) (2001). Use of the grounds, which are generally open to the public, is governed by state regulations rather than by Columbus ordinances. *See* Ohio Rev. Code Ann. § 105.41(E)(2). The Capitol grounds includes the steps of the capitol itself, and all the area bounded by the surrounding streets, including the walkways, grassy areas, monuments and fountains contained therein. OAC § 128-4-01(B). CSRAB has plenary control of Capitol Square, and is empowered to promulgate rules and regulations for the use of the square. *See* Ohio Rev. Code Ann. § 105.41(D)(3), (E).

CSRAB makes the square available for speeches and public gatherings advocating various causes, both secular and religious, but requires a permit as a prerequisite for those activities. Although CSRAB issues the permits on a first-come, first-served basis, it may deny permits if in its discretion it finds that the planned activity fails to meet one of five criteria.[2] OAC § 128-4-02(A). In order to obtain a

---

[2]In pertinent part, the regulation provides that "Capitol buildings or grounds are available for use by the public for the purpose of governmental business, public meetings for free discussion of public questions, or for activities of a broad public purpose, provided the authorized procedure has been followed and appropriate approvals have

permit, a person seeking to use the capitol grounds must apply, in writing, to CSRAB anywhere from 15 to 180 days prior to the planned event. OAC § 128-4-03(A). The application must include, *inter alia*, the name, address and telephone number of the person responsible for organizing the event, and must be accompanied by a $20 fee "to cover the administrative cost of issuing a permit." OAC § 128-4-03(A)(6), (C).

CSRAB reviews timely filed applications and issues a response, generally granting the permit unless there is a conflict for use of the space or the use threatens to violate the restrictions of § 128-4-02(A). CSRAB may waive the timeliness requirements "for good cause shown." OAC § 128-4-03(A), (Q).

On April 11, 2002, Parks entered the capitol grounds, positioned himself on a sidewalk near a plaque bearing the Ohio state motto, "With God, All Things Are Possible," and began to preach. On the same day, an animal rights group called Protect Our Earth's Treasures ("POET") staged a small rally in the same area of Capitol Square, to call on Ohio's legislature to adopt an excise tax on meat. POET had a permit to gather there, obtained with a waiver of the 15-day waiting period because the legislature had taken up a tax measure on short notice. Although Parks and the leader of the POET rally were aware of each other's presence, there is no

---

been received, if such use:

  (1) Does not interfere with the primary use of the capitol buildings or grounds;
  (2) Is appropriate to the physical context of the capitol buildings or grounds;
  (3) Does not unduly burden the managing authority;
  (4) Is not a hazard to the safety of the public or state employees; and
  (5) Does not expose the state to the likelihood of expenses and/or damages which cannot be recovered."

OAC § 128-4-02(A).

indication in the record that Parks's preaching disrupted POET's activities. Nor did the permit indicate that POET had the exclusive right to use any portion of Capitol Square.

Shortly after Parks began speaking, two uniformed OSHP troopers approached him and asked him to present his permit. Learning that Parks had none, the troopers told him that he would have to leave. The supervising officer informed Parks that a permit was required for speaking on the capitol grounds, but he was free to speak on the perimeter sidewalks without a permit. Parks, fearing arrest, complied with the troopers' request to leave.

He returned to Capitol Square on April 19, 2002. This time instead of preaching he wore a sandwich board bearing religious content and distributed leaflets with religious messages. Again, Parks had not obtained a permit. Parks testified in the district court that his religious beliefs preclude him from obtaining a permit to preach. As Parks had no permit, OSHP troopers again confronted him and asked him to leave the area. The troopers told Parks that he would be arrested and charged with criminal trespass if he remained. Parks complied with the request and left the area.

On January 31, 2003, Parks filed suit in the district court seeking a declaratory judgment and a permanent injunction preventing CSRAB from enforcing its permitting scheme against his activities. After conducting an evidentiary hearing, the district court entered an order on June 4, 2003, permanently enjoining CSRAB from enforcing the permitting scheme "against individual speakers." The district court concluded that, in several respects, the permitting scheme was not narrowly tailored to serve a significant government interest.

The district court found that the Capitol Square area was a public forum, but did not find it necessary to determine whether the area was a "traditional public forum" or a "designated public forum," as the relevant constitutional tests

in the context of this case are the same. For five reasons, the district court found that CSRAB's permitting scheme was not narrowly tailored to serve a significant government interest, as required by the First Amendment.

First, the district court reasoned that the permitting scheme lacked any meaningful time limit on the permitting process. The district court considered the regulation requiring CSRAB to act "without unreasonable delay" to be so vague as to "impose[] no concrete period of time in which the CSRAB must decide whether to issue a permit." The lack of a definite time period, in the district court's view, created an impermissible risk of the suppression of ideas, and this concern was not allayed by the "first-come, first-served" standard, inasmuch as the standard could be waived by CSRAB.

Second, the district court concluded that the permitting scheme granted CSRAB overly broad discretion to waive its $20 permit fee. Although the district court noted that there was no evidence of improper manipulation of the permit fee to include or exclude certain speakers for content-based reasons, it reasoned that the permitting scheme was flawed nonetheless because there were no restrictions to permit CSRAB from applying waivers to the permit fee for content-biased reasons in the future. Moreover, the district court concluded, CSRAB "failed to present a correlation between the permit fee and the costs associated with the permit scheme."

Third, the district court reasoned that the permitting scheme lacked precise standards to guide CSRAB's discretion in determining whether to grant or deny a permit to use Capitol Square. According to the district court, the provision by which CSRAB "reserves the right to regulate any conduct or activity not appropriate or consistent with the use of the capitol buildings or grounds, or which may cause damage to state property" gives CSRAB discretion to exclude virtually

any activity without sufficient safeguards to prevent the suppression of speech.

Fourth, the district court identified three problems with the permitting scheme that implicated the Supreme Court's opinion in *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002). The district court noted first that the requirement that permit seekers identify themselves on the permit application might deter speakers who prefer to remain anonymous. The district court also concluded that the permit scheme would chill a substantial number of religious speakers who might opt to remain silent rather than to ask the Government's permission to engage in evangelical activities. Also, the district court reasoned that the permitting scheme eliminates a substantial amount of spontaneous speech because the advance notice requirement precludes the expression of speakers who wish to express themselves at the moment the speech becomes ripe.

Fifth, the district court further concluded that the permitting scheme was invalid in particular as applied to individual speech. The district court reasoned that  the scheme proscribed more speech than was necessary to effectuate the "laudable" and important government interests of "preserv[ing] . . . the historical site, maintaining order and safety, ensuring that adequate support services are available, and maintaining the primary use of Ohio's Statehouse to carry out the business of state government . . . ." CSRAB, according to the district court, does not "explain sufficiently how requiring a lone individual to obtain a permit actually targets the preservation of the grounds":

the permit scheme labels those lone individuals with something to say as dangerous, while failing to offer what distinguishes them from other lone individuals who traverse onto capitol grounds, for example, to enjoy their lunch on the Statehouse steps. The distinctions—the addition of a sign, a leaflet, or something to say—become, in the words of the Ninth Circuit,

"absolutely empty in terms of the [regulation's] stated goals." *Grossman* [*v. City of Portland*], 33 F.3d at 1207 . . . .

The district court concluded that the permit scheme constituted an impermissible prior restraint on speech, a prior restraint that was unconstitutional *on its face* with respect individual speakers, and *as applied* to Parks. The district court permanently enjoined the defendants from enforcing the permit scheme against individual speakers. Defendants appeal.

## II

We affirm on the narrow ground upon which the district court concluded its opinion, that the permitting scheme as it presently exists is invalid with respect to individuals.[3] The injunction is limited to relief against enforcement of the permitting scheme against individuals, and that is all that we have before us. The district court expressly refrained from enjoining continued application of the permit scheme "as it pertains to groups," and we take this limitation to extend to individuals speaking as part of a previously coordinated or organized effort to create a crowd. Much of the district court's rationale would appear to invalidate the permitting scheme as applied to groups as well. We are largely unpersuaded by the parts of the district court's reasoning that would logically invalidate the permitting scheme altogether. Affirmance of the injunction that was actually entered by the district court does not require us to make a definitive ruling on those issues, and we therefore consider them only briefly.

---

[3]CSRAB does not challenge the district court's determination that the Capitol grounds area at issue is a public forum, and the parties on appeal make no issue of whether the area is a "traditional public forum" or a "designated public forum." The district court found that its analysis did not require that the distinction be made in this case, and our analysis as well does not require that we make such a determination.

The permitting scheme does not appear to vest unconstitutional discretion in CSRAB to grant and deny permits to engage in expressive activity on Capitol Square. When a law predicates expressive activity on the prior acquisition of a permit, the law must contain narrow and precise standards to control the discretion of the permitting authority. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992). Section 128-4-02(A), with the possible exception of subsection (3), contains clear and precise standards which CSRAB can apply in making permitting determinations.

The district court determined that the permitting scheme grants CSRAB virtually unchecked discretion to deny permits for content-based reasons. In support of this conclusion, Parks isolates several terms in the regulation that he claims would allow CSRAB to conceal favoritism or censorship in making permit determinations. Most of the terms clearly limit the decision-maker's discretion. *See City of Lakewood v. Plain Dealer Publ'g. Co.*, 486 U.S. 750, 758 (1988) (explaining that "[o]nly standards limiting the licensor's discretion will eliminate" danger of chilling protected speech). There is no statute or regulation imaginable that does not require some degree of interpretation by the agency charged with its enforcement. The First Amendment requires only that the regulation give the agency sufficient standards to apply in determining whether to issue a permit. In our view, the standards "appropriate to the physical context of the capitol," "hazard to the safety of the public," and "expose the state to the likelihood of [unrecoverable expenses]," are not so vague as to engender content-based favoritism. Although these terms do require CSRAB to evaluate whether an activity conflicts with one of these provisions, these terms provide CSRAB sufficient guidance to determine whether it would be appropriate to deny a permit, and allow for effective judicial review.

It is a closer question with respect to § 128-4-02(A)(3), which allows CSRAB to deny a permit if an activity "unduly

burden[s] the managing authority." Without a definition of "undue burden," or even an exemplary list of "burdensome" activities, the provision arguably leaves it to CSRAB to decide on any basis whether the burden of an activity on the managing authority is undue. On the other hand, it is reasonably clear that the provision addresses the concern that some activities require extra public expenditures for sanitation or police presence. A court reviewing a denial of a permit to Parks could easily conclude that there was no undue burden on the managing authority to permit him to speak. We leave for another day the question of whether this provision warrants invalidation of the permitting scheme with respect to groups. It provides but a questionable basis for the order in this case invalidating the permitting scheme with respect to individuals like Parks.

The district court's reliance on the waiver provision in § 128-4-02(I) as a basis for invalidating the permitting scheme is also questionable. In this regard, Parks maintains that the phrase "for good cause shown" allows CSRAB to waive or refuse to waive the permit rules for virtually any reason. Although he produced no evidence that CSRAB granted waivers in an arbitrary or discriminatory fashion, Parks maintains that the discretion contained in the provision alone renders it unconstitutionally defective.

Because the waiver provision does not act as a restriction on expressive activity, the discretion must be treated differently from that contained in the bases for granting or denying a permit. Even where discretion is broad, we would generally not invalidate a waiver provision for overly broad discretion unless and until there is a showing of "a pattern of unlawful favoritism." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002). To do otherwise would have the unintended effect of restricting more speech because CSRAB could not relax its permitting rules to increase access to the forum. A rigid application of the permitting scheme would prevent any group with an emergent need, or any speaker with the inability to pay the permit fee, to use Capitol Square for

speech activities. It is undoubtedly preferable to allow some flexibility in the name of increasing the exercise of protected speech.

That is not to say that the exercise of discretion in granting and denying waivers could not, in some instances, present constitutional problems. When a permitting authority uses waivers to promote preferred speakers or to inhibit disfavored speakers, a court may invalidate the waiver scheme. *See id.* In order to predicate a constitutional challenge to the waiver provision based on the existence of discretion in the regulatory scheme, a plaintiff would bear the burden of establishing that the permitting authority used the waivers in a discriminatory manner. Parks, however, produced no evidence that CSRAB used its discretion to grant waivers to preferred speakers, or deny waivers to disfavored speakers.

The district court also found unconstitutional vagueness in the provision in the regulation that "[t]he board shall, without *reasonable* delay, act upon the request [for a permit]." OAC § 128-4-03(B) (emphasis added). The district court found that this phrasing precluded reasonable delay but not unreasonable delay. The language in the regulation, however, was obviously a scrivener's error; the intent was undoubtedly to require the board to take action without *un*reasonable delay. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (explaining that, where literal reading of statute is obviously at odds with intentions of drafters, the drafters's intent must control). The regulation has since been revised to correct the error. OAC § 128-4-03(B) (Anderson 2004). This part of the district court's analysis does not support the issuance of the injunction.[4]

---

[4]The district court relied on another apparent scrivener's error in questioning the reasonability of the hours during which the grounds were open. The court read the relevant regulation as limiting availability of the capitol grounds to morning hours. The regulation did limit availability to the hours of "7 a.m. to 12:00 p.m.," but "12 p.m." was obviously intended to mean midnight. The regulation has since been corrected to

## III

The injunction is warranted, however, because application of the permitting scheme to individuals like Parks, who may be speaking, wearing signs, and/or leafletting, unconstitutionally burdens free expression in violation of the First Amendment. Two aspects of the permitting scheme lead us to this conclusion.

First, the regulation by its ambiguity sweeps too broadly with respect to when an individual must obtain a permit. The language of the regulation does not literally prohibit activity in the absence of a permit, but instead makes the Capitol grounds

> *available* for use by the public for the purpose of governmental business, public meetings for free discussion of public questions, or for activities of a broad public purpose, provided the authorized procedure has been followed and appropriate approvals have been received, if such use [here follow the five conditions discussed above].

OAC § 128-4-02(A) (emphasis added). The obvious negative inference, assumed by the parties and the district court, is that the grounds are *unavailable* for the named activities without a permit. If we make the same assumption, then the regulation prohibits the following activities without a permit: (1) use for the purpose of governmental business, (2) "public meetings for free discussion of public questions," and (3) "activities of broad public purpose." The first two are obviously not applicable to individuals like Parks: there is no governmental business involved, and an individual speaker is not a "meeting." It follows that the regulatory basis for telling Parks to stop his activities was that he was conducting

---

read "seven a.m. to twelve midnight." OAC § 128-4-02(D) (Anderson 2004).

an "activity of broad public purpose" on the Capitol grounds without a permit.

This ban is exceptionally broad, as demonstrated by the facts of this case. When Parks first came to the Capitol grounds, he was engaged in public declamation, apparently directed at least in part to the POET crowd, and he was told to stop. When he returned, a week later, he merely wore the sandwich boards and handed out leaflets, but again he was told to stop. It is certainly not clear from the record that merely wearing the sandwich boards, without the leafletting, would have been allowed without a permit. And it is hard to see how wearing sandwich boards is in any relevant respect different from wearing an expressive T-shirt or carrying an expressive balloon. The permitting scheme, then, by the breadth of the activity that to which it applies, raises serious First Amendment concerns.

Second, we are instructed by the Supreme Court in *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002), to give weight to the concern that a permitting scheme will stifle spontaneous expressive activity. In *Watchtower*, the Supreme Court invalidated a village ordinance that required that door-to-door canvassers obtain a prior permit from the mayor's office by completing and signing a registration form. Applying the ordinance to all canvassers raised constitutional concerns by virtue of the very breadth of the ordinance:

It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition.

536 U.S. at 165-66. While there are some important differences between the permit scheme in this case and the one at issue in *Watchtower*, one of the core reasons for invalidating the latter clearly applies to the permit scheme in this case as applied to individuals. That is, the permitting scheme effectively bans spontaneous speech on the Capitol grounds. The Supreme Court expressed this concern in *Watchtower* in the following words:

there is a significant amount of spontaneous speech that is effectively banned by the ordinance. A person who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit. Even a spontaneous decision to go across the street and urge a neighbor to vote against the mayor could not lawfully be implemented without first obtaining the mayor's permission.

536 U.S. at 167.

Similarly, under the CSRAB permit scheme, two friends debating which candidate should be elected President in November while walking across the Capitol grounds are regulated by the permitting scheme, at least according to its literal terms, but it is highly unlikely that these people would continue their discussion if they knew a permit was required to do so. The permitting scheme also constrains the heckler who wishes to disagree with the expressive activity of a permitted activity. A beef rancher out for a leisurely stroll along Capitol Square who happened upon the POET demonstration and wished to take on the protestors on the issue of meat taxation would first need to obtain a permit to carry on debate with POET. If the rancher were aware that a permit were required to debate this issue, he might be more likely to keep his mouth shut as he passed the demonstration. In each of these hypothetical situations, not only would the speakers need to pay $20 and obtain permits, but they would either need to have done so fourteen days prior to speaking or

to have shown good cause for obtaining a waiver of the permit policy. The permit fee and the bureaucratic formalities involved in obtaining a permit are likely to chill casual speakers who would otherwise make statements on Capitol Square but find that the benefit of expression is far outweighed by the expense of applying for a permit. While these examples may appear far-fetched, there is no apparent way that the present regulation, applied as it has been, can easily be read not to apply.

The permitting scheme is thus a substantially overbroad restriction on individual speech. Although there may be some types of situations in which the regulation could validly be applied to individual speakers, such as if a famous rock singer were to start performing or a Klansman were to start spouting racist remarks,[5] the  permitting scheme sweeps a broad array of ordinarily protected speech within its regulatory purview. Indeed, it is close in its sweep to the Los Angeles Airport (LAX) resolution that the Supreme Court found facially unconstitutional in *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987).  That resolution stated  that "any individual and/or entity [who] seeks to engage in First Amendment activities within the Central Terminal Area . . . shall be deemed to be acting in contravention of the stated policy of the Board of Airport Commissioners . . . ." 482 U.S. at 571. The Court reasoned:

---

[5]CSRAB suggests that a lone Klansman conveying a racist message on the Capitol grounds could lead to a disruptive disturbance. Something more than the mere objectionability of the Klansman's speech is necessary, however, in order to warrant a restriction on his expression. Whether a speaker may be subjected to a permitting requirement must turn on the time, place and manner of speech, and not the content of the message or the likelihood that it will incite a response. *Forsyth County*, 505 U.S. at 134-35. If the Klansman example were enough to conclude that the permit requirement should be upheld in this case, then the example proves too much.  After all, the mere *presence* of certain controversial individuals might draw a crowd or incite a response, but that fact could not be a sufficient basis for requiring a permit for any individual to enter a public forum.

The resolution therefore does not merely reach the activity of respondents at LAX; it prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing. Under such a sweeping ban, virtually every individual who enters LAX may be found to violate the resolution by engaging in some "First Amendment activit[y]." We think it obvious that such a ban cannot be justified even if LAX were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech.

*Id.* at 574-75. Under the sweeping ban of OAC § 128-4-02 on "activities of a broad public purpose," one could also read a ban on "wearing of campaign buttons or symbolic clothing." Of course the CSRAB regulation, rather than prohibiting the activity, only requires a prior permit, but the sweeping facial effect is similar.  When it comes to wearing a campaign button or symbolic clothing, requiring a permit obtained 15 days ahead of time, at a cost of $20, is pretty close in its effect to an outright prohibition.[6]

The CSRAB permit scheme is also not sufficiently narrowly tailored.  As the Court in *Watchtower* instructs, breadth alone does not render a permitting scheme invalid. 536 U.S. at 168.  It must also be determined whether the scheme is narrowly tailored to the government's interest. *Id*. The *Watchtower* Court held that the ordinance in that case was insufficiently tailored to be warranted by the city's legitimate interests in preventing fraud and crime, and in protecting citizens' privacy.  In the instant case, CSRAB has indeed identified important government interests supporting the need for a permitting process.  These include CSRAB's

---

[6]Parks invokes two other concerns raised by the *Watchtower* court: the protection of those who choose to speak anonymously and those who would be chilled from speaking because of religious scruples against seeking state permission to preach.  In view of our resolution of this appeal, we need not decide whether these concerns weigh against the CSRAB permitting scheme.

interests in protecting the physical condition of Capitol Square, ensuring the safety of the public, and ensuring that permitted speakers are able to engage effectively in expressive activities. The permitting scheme as it is now structured however restricts more expressive activity than is necessary to accomplish those goals, and is not narrowly tailored to meet these goals. Instead, the permitting scheme regulates a significant amount of casual and spontaneous speech that is unlikely to implicate these significant concerns.

In determining whether regulation of expressive activity is narrowly tailored, we look to determine whether the substantial government interest would be achieved less effectively without the permitting scheme. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Particular types of individual activity that might cause damage, endanger public safety, or interfere with other speakers, can be governed just as effectively, if not more so, by regulations prohibiting or limiting such actions directly, without imposing the requirement that individuals wanting to speak or carry a sign obtain a permit 15 days ahead of time. For instance, the current regulatory limitations on permittees, if not already binding on persons legally present without a permit, could easily be extended to such persons. These include limits on bringing structures or vehicles on the grounds, attaching signs or banners to buildings, bringing animals on the grounds, commercial solicitation, operating concessions, possessing alcohol, or using sound amplification. *See* OAC § 128-4-03(G)-(M). The blanket application of the permitting scheme to individuals, in contrast, is not sufficiently narrowly tailored to the interests of protecting property, promoting safety, and permitting others to speak.

In *Ward*, the Supreme Court held that narrow tailoring did not require the least restrictive means of serving legitimate government interests, but that narrow tailoring is satisfied as long as the regulation promotes a substantial government interest that would be achieved less effectively absent the

regulation. 491 U.S. at 798-99. In upholding a requirement that New York City's sound technician control the mixing board during rock concert performances, the Court in *Ward* distinguished a total ban on handbills as follows:

> The guideline does not ban all concerts, or even all rock concerts, but instead focuses on the source of the evils the city seeks to eliminate—excessive and inadequate sound amplification—and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils. This is the essence of narrow tailoring. A ban on handbilling, of course, would suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, whether they be fraud, crime, litter, traffic congestion, or noise. See *Martin v. Struthers*, 319 U.S. 141, 145-146 (1943). For that reason, a complete ban on handbilling would be substantially broader than necessary to achieve the interests justifying it.

491 U.S. at 799 n.7. This case is closer to the handbill ban than to the regulation upheld in *Ward*.

CSRAB also asserts that the permitting process is necessary to regulate competing uses of the grounds and protect the free speech rights of those who use the process to obtain access to the grounds. Relying on our decision in *Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996), CSRAB maintains that the permitting scheme enables it to "enhance" free speech rights by limiting the use of areas on the capitol grounds to one permitted group, thereby amplifying the message of that group. In *Sistrunk*, we found no First Amendment violation when an official for the Bush-Quayle '92 campaign confiscated a button advocating the opposing candidate from a young woman seeking admission to a rally for the Bush-Quayle campaign conducted in a public park. *Id.* at 196. *Sistrunk* makes clear that the First Amendment "does not prohibit the [government] from issuing permits to groups

seeking to make exclusive use of the Commons for expressive activity during a limited period of time." *Id*. at 198.

*Sistrunk* is distinguishable in two important ways. First, this is not a situation where one organization has been given an exclusive permit to use grounds for a limited period. In *Sistrunk*, the permit specifically provided that the use of the grounds was limited to the members of the permittee organization and their invitees. *Id*. at 196. The campaign committee had its own First Amendment interest in controlling who could attend its rally and what could be said there. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573-74 (1995) (holding that organizers of Boston's St. Patrick's Day-Evacuation Day Parade had First Amendment interest in excluding marchers with messages that organizers chose not to convey). In contrast, the record does not show that POET was granted an exclusive permit to use a portion of the grounds, or that Parks was in that exclusive area, or indeed that POET objected to Parks's presence.

Second, in the instant case there is a greater level of governmental involvement in the filtration of inconsistent messages than in *Sistrunk*. In *Sistrunk*, while the government granted the permitted organization the power to make exclusive use of the park, the government itself did not sort out "discordant speakers" whose messages were inconsistent with the theme of the demonstration. In the instant case, state troopers determined that Parks's activities were inconsistent with the permitted use. Although the government may have the power to grant permits for speakers to use public lands, and the speakers have First Amendment rights to exclude others whose messages are conflicting or inconsistent, that does not permit a governmental authority to determine which messages are discordant and to excise those messages to ensure the clarity of the permitted speaker's message.

If Parks tried to interpose himself in POET's rally so that he appeared to be a participant in that rally, and he

complained that a member of POET asked him to leave, perhaps *Sistrunk* would have some application in this case. Here, however, Parks happened to be standing in the general vicinity of POET's demonstration, but made no attempt to appear affiliated with it. There is no indication in the record that Parks disrupted POET's rally or that the POET organizers felt that Parks's presence imposed upon the protest. Moreover, there is no indication that there was any permitted use on April 19 when OSHP troopers asked Parks to leave Capitol Square because he was wearing sandwich boards and handing out leaflets. CSRAB cannot avail itself of *Sistrunk* with regard to that incident.

This case is also different from our well-reasoned, albeit unpublished, decision in *Spingola v. Village of Granville*, 2002 WL 1491874 (6th Cir., July 11, 2002). In that case, for the duration of an assemblage permit issued to the Granville Kiwanis Club to hold a Fourth of July celebration on a portion of the village streets, a village ordinance provided that Granville could designate within the assemblage area a public speaking area. We upheld the ordinance's prohibition of "public speaking designed to gather crowds" in the assemblage area outside of the designated public speaking area. We reasoned that the village had a significant interest in crowd control, and that the interest would be less effectively achieved without the ordinance because preventing uncontrolled public speaking "provid[ed] a smoother flow of traffic within the festival crowd." *Spingola* involved two factors different from the instant case. First, the ordinance applied during the limited-duration grant of a permit to another private party to use a portion of the public streets. Second, the ordinance was specific in the expressive activity that was isolated—"public speaking designed to gather crowds"—activity that, so tailored, had a direct impact on the village's interest in crowd control. In contrast, the CSRAB prohibition on "activities of a broad public purpose," extending as it does to the mere wearing of a sign and handing out of leaflets, cannot be considered narrowly tailored to the interests CSRAB has identified.

The CSRAB permitting scheme as enforced against individuals thus is not narrowly tailored to a significant government interest, and this conclusion is sufficient to uphold the district court's injunction. We therefore need not reach the additional requirement that ample alternative channels be left open for communication.

In concluding, we emphasize the limited nature of our holding. The injunction does not preclude the enforcement of the present permitting scheme to groups. The injunction is expressly limited to individuals. We interpret this limitation to allow application of the permit requirement to gatherings of multiple persons by previous publicity or pre-arranged coordination. We need not decide at this time the constitutionality of applying the permitting scheme to such gatherings.

In addition, the injunction does not prevent CSRAB from modifying its regulations to require a prior permit for certain types of individual conduct, albeit expressive, that may more directly implicate concerns of public order or safety. We have been advised during our consideration of this case, for instance, that a gentleman was considering parachuting onto the Capitol grounds. Nothing prevents the CSRAB from requiring a permit for such a stunt. And as our discussion of *Spingola* demonstrates, the injunction does not prohibit CSRAB from modifying its regulations to require a permit for public speaking that is designed to gather an audience, although we certainly do not decide the validity of such a hypothetical CSRAB rule today. We note only that a modification of the regulation to require a permit for such individual activities would not run afoul of the district court's injunction, which by its terms extends only to enforcement of the regulation "presently set forth" in OAC § 128-4.[7]

---

[7]CSRAB has not argued, in light of the absence of a certified class, that the district court's order should have enjoined enforcement of the permitting scheme against Parks only, and not against other individuals

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

who are not parties. Accordingly, we do not reach that issue.

---

**DISSENT**

---

COOK, Circuit Judge, dissenting. Because I disagree with the majority's conclusion that CSRAB's regulations are vague, overbroad or not narrowly tailored, I respectfully dissent.

First, CSRAB's permitting scheme is not a "ban." It does not prohibit speech; it merely regulates the time, place, and manner of speaking to accommodate the government's interest in maintaining the Capitol grounds. Such regulations are valid "provided the restrictions [of protected speech] are 'justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). CSRAB's regulations satisfy all three criteria.

That CSRAB's regulations are content-neutral and leave available ample alternative channels of communication is not in dispute. And contrary to the majority's conclusion, the regulations are narrowly tailored because they "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. In *Thomas v. Chicago Park District*, the Supreme Court upheld a permit system that, like the one here, enabled the government "to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event." 534 U.S. 316, 322 (2002).

Although the permit scheme in *Thomas* could be considered more narrowly tailored than CSRAB's policy, the fact that this court can imagine regulations that would be more closely tailored to achieving CSRAB's goals does not mean that CSRAB's scheme is unconstitutional—"[the Supreme Court's] cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Ward*, 491 U.S. at 797 (internal quotation marks omitted). CSRAB's interests in preserving the Capitol grounds and maintaining order and safety are substantial, and they would be achieved less effectively if individual speakers were not required to comply with the permitting regulations.

Additionally, I disagree with the majority's conclusion that the phrase "for broad public purpose" is so vague as to render the regulations facially unconstitutional. The regulations applied to Parks's conduct because he was preaching and distributing leaflets to the public. If someone were "wearing an expressive T-shirt or carrying an expressive balloon" and also standing on the Capitol grounds in an effort to communicate with the public, then her conduct would likewise require a permit. The majority's statement that it is affirming the district court's injunction only with respect to individuals, but not with respect to individuals "speaking as part of . . . [an] organized effort to create a crowd," implicitly recognizes that valid, non-vague regulations can draw distinctions based on speakers' different purposes. The majority draws a somewhat different distinction than CSRAB has drawn—the majority's opinion requires two or three individuals organized for the purpose of creating a crowd, but not two or three individuals who just happen to show up on the Capitol Square at the same time, to obtain permits—but under both the majority's opinion and CSRAB's regulations, whether a speaker must obtain a permit depends upon the speaker's purpose.

I also disagree that the regulations are overbroad. The regulations are not overbroad because they do not prohibit *any* constitutionally protected speech, much less the "substantial amount" of protected speech that would justify a finding of facial invalidity. *See Kreimer v. Bureau of Police*, 958 F.2d 1242, 1265 (3d Cir. 1992) ("[T]he doctrine of overbreadth is appropriately applied in a facial challenge only where 'the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail'" (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982))); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

Rather than proscribing speech, the regulations establish a permitting scheme that applies only to speakers using Capitol Square for "activities of a broad public purpose." Ironically, the majority reads this phrase as prohibiting virtually all speech—equating it with the Los Angeles International Airport's "First Amendment Free Zone"—but the phrase instead *constrains* the reach of the permitting scheme. The majority's hypothetical T-shirt wearers or balloon carriers might fall within the ambit of the permitting scheme, but only if the purpose of their activity on Capitol Square were broadly public. And nothing in the record suggests that the regulations would apply to "two friends debating which candidate should be elected President in November while walking across the Capitol grounds," because these speakers would be engaged in a private conversation rather than an activity of broad public purpose. For the same reason, the majority's concerns about stifling spontaneous speech are unfounded. As for the rancher who might want to stop and "debate" with the members of POET, nothing in the First Amendment grants a would-be heckler the right to disrupt the message of other speakers.

For the foregoing reasons, I respectfully dissent.